BROTHERHOOD OF RAILROAD TRAINMEN ET AL.
*v.* JACKSONVILLE TERMINAL CO.

No. 69.   Argued December 11, 1968.—Decided March 25, 1969.

*Neal P. Rutledge* argued the cause for petitioners. With him on the brief was *Lester P. Schoene.*

*Dennis G. Lyons* argued the cause for respondent. With him on the brief were *Paul A. Porter* and *Daniel A. Rezneck.*

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Francis M. Shea, Richard T. Conway, Ralph J. Moore, Jr.,* and *James A. Wilcox* filed a brief for the National Railway Labor Conference as *amicus curiae* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case arises out of the Nation's longest railroad labor dispute, much of the history of which is recorded in the pages of the United States and federal reports.[1] The events most pertinent to the present litigation began on April 24, 1966, when the Florida East Coast Railway Company (FEC), having exhausted all procedures required by the Railway Labor Act [2] for the resolution of a "major dispute," [3] unilaterally changed its operating employees' rates of pay, rules, and working conditions. Petitioners, who represent FEC's operating employees, responded by calling a strike and thereafter by picketing the various locations at which FEC carried on its operations, including the premises of the respondent, Jacksonville Terminal Company.[4]

---

[1] See *Railway Clerks* v. *Florida E. C. R. Co.,* 384 U. S. 238 (1966); *Railroad Trainmen* v. *Atlantic C. L. R. Co.,* 362 F. 2d 649, aff'd, 385 U. S. 20 (1966); *Florida E. C. R. Co.* v. *Railroad Trainmen,* 336 F. 2d 172 (1964). Cf. *Locomotive Engineers* v. *Baltimore & O. R. Co.,* 372 U. S. 284 (1963).

[2] 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*

[3] See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722–725 (1945); *Florida E. C. R. Co.* v. *Railroad Trainmen, supra,* at 178–179; Part III, *infra.*

[4] Petitioners are the Brotherhood of Railroad Trainmen, the Order of Railway Conductors and Brakemen, the Brotherhood of Locomotive Firemen and Enginemen, and several union officers. Petitioners contend that only the BRT and its officers were responsible for the picketing, and that the injunction was improper as to the others. Because of our disposition of the case we do not reach this question, and we treat petitioners jointly, as did the state courts.

On the complaint of respondent and two railroads other than FEC, a United States District Court issued a temporary restraining order several hours after the picketing began, and later enjoined petitioners from picketing respondent's premises except at a "reserved gate" set aside for FEC employees. The Court of Appeals for the Fifth Circuit reversed, holding that the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 *et seq.,* prevented issuance of a federal injunction. *Railroad Trainmen* v. *Atlantic C. L. R. Co.,* 362 F. 2d 649 (1966). We affirmed by an equally divided Court. 385 U. S. 20 (1966).

While that litigation was pending in the federal courts, respondent instituted the present action for injunctive relief in the Florida Circuit Court. Petitioners removed the action to the United States District Court, which promptly remanded to the state court. The Florida court issued a temporary injunction, substantially identical to the earlier federal order, which it made final after a full hearing. On appeal, the Florida District Court of Appeal affirmed *per curiam.* The Supreme Court of Florida denied certiorari and dismissed the appeal. We granted certiorari, 392 U. S. 904 (1968), to determine the extent of state power to regulate the economic combat of parties subject to the Railway Labor Act.

I.

Respondent, a Florida corporation, operates a passenger and freight rail terminal facility in Jacksonville, Florida, through which rail traffic passes to and from the Florida peninsula. The corporation is jointly owned and controlled by four railroad carriers, including FEC, which enjoy the common use of the terminal's facilities and services, and share equally in its operation.[5]

---

[5] The three other roads are the Atlantic Coast Line Railroad Co., the Seaboard Air Line Railroad Co., and the Southern Railway

FEC carries on substantial daily operations at the terminal, interchanging freight cars with the other railroads; it accounts for approximately 30% of all interchanges on the premises. Respondent provides various services necessary to FEC's operations, including switching, signalling, track maintenance, and repairs on FEC cars and engines. Without the work and cooperation of employees of respondent (and the other railroads) FEC could not carry on its normal activities at the terminal. In short, "despite the legal separateness of the Terminal Company's entity and operation, it cannot be disputed that the facilities and services provided by the Terminal Company *in fact* constitute an integral part of the day-to-day operations of the FEC . . . ." *Railroad Trainmen* v. *Atlantic C. L. R. Co.*, 362 F. 2d 649, 651 (1966).

Respondent maintains a "reserved gate" for the exclusive use of all FEC employees entering the terminal premises on foot to begin their workday. Notices to this effect are posted, but compliance is not policed: FEC employees use other entrances as well, and other employees use the FEC reserved entrance. The terminal has a number of other foot, road, and rail entrances, through which pass employees of respondent and the railroads using the premises. No entrances are set aside to separate those employees of respondent and the other railroads who provide services for FEC from those who do not; nor, with one or two possible exceptions, do trains making interchanges with FEC pass through different gateways from those which do not. The joint and

System. Effective July 1, 1967, Coast Line and Seaboard merged. See *Florida E. C. R. Co.* v. *United States,* 259 F. Supp. 993 (1966), aff'd, 386 U. S. 544 (1967).

For a discussion of one aspect of this unusual joint venture agreement, see *Jacksonville Terminal Co.* v. *Florida E. C. R. Co.,* 363 F. 2d 216 (1966).

common use of the premises and facilities would, presumably, render such separations impracticable.

On May 4, 1966, petitioners began to picket almost every entrance to the terminal. The signs stated clearly that the dispute was with FEC alone, and urged "fellow railroad men" not to "cross" and not to "assist FEC." [6] The picketing was entirely peaceful. It lasted only a few hours, until it was curtailed by a federal temporary restraining order, and thereafter by a series of federal and state injunctions.

The Florida Circuit Court found that resumption of general picketing "would result in a virtual cessation of activities . . . of the Terminal Company," and would cause serious economic damage to the entire State. Joint App. 183. The court held that the picketing constituted a secondary boycott illegal under state law; that it unjustifiably interfered with respondent's business relations; that it violated the State's restraint of trade laws, Fla. Stat. § 542.01 *et seq.* (1965); and that it sought to force respondent to violate its duties as a carrier under the Florida Transportation Act.[7] On

---

[6] The signs read:

"Fellow Railroad Men
Do Not Cross or Assist F. E. C.
B. of R. T.
On Lawful
Strike
Against F. E. C.
Please Make Common Cause With Us In
Major Dispute Against F. E. C."

A union official directing the picketing testified at the state hearing that picket lines at the rail entrances would have been taken down to allow movements unconnected with FEC to pass.

[7] Fla. Stat. §§ 351.12, 351.14–351.17, 351.19 (1965). These are duties, in essence, to transport and transfer freight and freight cars.

this basis, the court enjoined petitioners from picketing the terminal except at the FEC reserved gate, and from causing or inducing respondent's employees to cease performing their duties of employment in connection with the FEC dispute.

## II.

We consider initially petitioners' argument that the jurisdiction of the Florida court was ousted by the primary and exclusive jurisdiction of the National Labor Relations Board. Cf. *San Diego Unions* v. *Garmon,* 359 U. S. 236 (1959).

It is not disputed that petitioners, the respondent and its employees, and the railroads (including FEC) that use the terminal as well as their employees, are subject to the Railway Labor Act. See §§ 1 First, Fourth, 44 Stat. 577, as amended, 45 U. S. C. §§ 151 First, Fourth; Interstate Commerce Act, as amended, § 1 (3), 24 Stat. 379, 49 U. S. C. § 1 (3). The petitioner organizations "are composed predominantly and overwhelmingly of employees . . . subject to the Railway Labor Act," Joint App. 93; all pickets were members of local lodges composed solely of such employees, and were employees of the FEC. *Id.,* at 94. However, the organizations' national membership includes a small percentage of employees who are not subject to the Railway Labor Act,[8] and who may be subject to the National Labor Relations Act, 49 Stat. 449, as amended by the Labor Management Relations Act, 1947, 61 Stat. 136, 29 U. S. C. § 151 *et seq.* Petitioners contend that this is sufficient to bring the present dispute arguably within the NLRA, and they assert that until the National Labor Relations Board decides otherwise, no court may

---

[8] Seven percent of the BRT, 7% of the BLF&E, and 2% of the ORC&B are "employees of employers who are not subject to the Railway Labor Act." Joint App. 93–94.

assume jurisdiction over the controversy. Cf. *Marine Engineers* v. *Interlake Steamship Co.*, 370 U. S. 173 (1962).[9]

This argument proves too much. For on petitioners' theory, it is hard to conceive of any railway labor dispute that is not "arguably" subject to the NLRB's primary jurisdiction. A serious question would be presented whether the parties to such a dispute were ever obligated to pursue the Railway Labor Act's procedures, and whether the Mediation and Adjustment Boards could ever concern themselves with a dispute—until the matter had first been submitted to the NLRB and that agency had determined that it lacked jurisdiction.

This was not meant to be. The NLRA came into being against the background of pre-existing comprehensive federal legislation regulating railway labor disputes. Sections 2 (2) and (3) of the NLRA, 29 U. S. C. §§ 152 (2), (3), expressly exempt from the Act's coverage employees and employers subject to the Railway Labor Act.[10] And when the traditional railway labor organi-

---

[9] In *Marine Engineers*, a state court enjoined picketing by the Marine Engineers Beneficial Association, having found that the union represented only "supervisors," who are not "employees" subject to the NLRA. NLRA § 2 (3). We noted that decisions of the NLRB and lower courts had held the MEBA subject to the Act under some circumstances, and we reversed, holding that in any "doubtful case," 370 U. S., at 182, where there existed an "arguable possibility of Labor Board jurisdiction," *id.*, at 184, the matter must first be submitted to the NLRB.

[10] In the debates preceding enactment of the Taft-Hartley amendments, 61 Stat. 141, 29 U. S. C. § 158 (b), Senator Taft responded as follows to the criticism that it was inequitable to allow railroad employees to engage in conduct forbidden others by § 8 (b)(4) of the NLRA:

"I want to point out that railway labor has never been covered by the Wagner Act; it has always been covered by the Railway Labor Act, which provides a somewhat different procedure. We saw no reason to change that situation, because there were no abuses which

zations act on behalf of employees subject to the Railway Labor Act in a dispute with carriers subject to the Railway Labor Act, the organizations must be deemed, *pro tanto,* exempt from the National Labor Relations Act. See NLRA § 2 (5), 29 U. S. C. § 152 (5). *Marine Engineers, supra,* is inapposite. For assuming, *arguendo,* that this is a "doubtful case," 370 U. S., at 182, we were not there concerned with a conflict between two independent and mutually exclusive federal labor schemes.

Whatever might be said where railway organizations act as agents for, or as joint venturers with, unions subject to the NLRA, see *Electrical Workers* v. *NLRB,* 122 U. S. App. D. C. 8, 350 F. 2d 791 (1965); or where railway unions are engaged in a dispute on behalf of their nonrail employees; or where a rail carrier seeks a remedy against the conduct of nonrailway employees, see *Steelworkers* v. *NLRB,* 376 U. S. 492, 501 (1964); *Teamsters Union* v. *New York, N. H. & H. R. Co.,* 350 U. S. 155 (1956), none of these is this case. This is a railway labor dispute, pure and simple. And although we shall make use of analogies drawn from the NLRA to determine the rights of employees subject to the Railway Labor Act, see *infra,* Parts V–VII, the NLRA has no direct application to the present case.

## III.

The heart of the Railway Labor Act is the duty, imposed by § 2 First upon management and labor, "to

had arisen in connection with the operation of the Railway Labor Act." 93 Cong. Rec. 6498, 2 Legislative History of the Labor Management Relations Act, 1947, p. 1571.

In 1959, § 8 (b) (4) was amended to expand the class of persons protected against secondary pressures. 73 Stat. 542; see *Steelworkers* v. *NLRB,* 376 U. S. 492, 500–501 (1964). However, the amendment did not expand the scope of "employees" or "labor organizations" whom the Act forbade to engage in such conduct.

exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help— "the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." *Florida E. C. R. Co.* v. *Railroad Trainmen,* 336 F. 2d 172, 181 (1964). We have consistently so held in a long

line of decisions. *Railway Clerks* v. *Florida E. C. R. Co.,* 384 U. S. 238, 244 (1966); *Locomotive Engineers* v. *Baltimore & O. R. Co.,* 372 U. S. 284 (1963); *Railroad Telegraphers* v. *Chicago & N. W. R. Co.,* 362 U. S. 330 (1960); *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 725 (1945).

Both before and after enactment of the Railway Labor Act,[11] as well as during congressional debates on the bill itself,[12] proposals were advanced for replacing this final resort to economic warfare with compulsory arbitration and antistrike laws. But although Congress and the Executive have taken emergency *ad hoc* measures to compel the resolution of particular controversies,[13] no such general provisions have ever been enacted. And for the settlement of major disputes,

> "the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided

[11] See generally L. Lecht, Experience under Railway Labor Legislation 38, 46–47, 197–198, 221–222, 230–237 (1955); Use of Federal Power in Settlement of Railway Labor Disputes, H. R. Doc. No. 285, 67th Cong., 2d Sess., 76–85 (1922).

[12] See 67 Cong. Rec. 4508, 4512–4513, 4517–4518, 4569, 4582, 4648, 4702, 8814, 9205–9206 (1926).

[13] *E. g.,* Act of Aug. 28, 1963, Pub. L. 88–108, 77 Stat. 132. The Senate Report stated: "This proposal is not and cannot conceivably be considered as a precedent for the railroad industry . . . . It is what it purports to be—a one-shot solution through legislative means to a situation which imperiled beyond question the economy and security of the entire Nation." S. Rep. No. 459, 88th Cong., 1st Sess., 7 (1963). See generally 1 Federal Legislation to End Strikes: A Documentary History, c. VI, Subcommittee on Labor of Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. (Comm. Print 1967); 2 *id.,* cc. X, XI; L. Lecht, Experience under Railway Labor Legislation 176–177, 184–185, 195–196, 200–201, 206–207 (1955).

and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." *Elgin, J. & E. R. Co.* v. *Burley, supra,* at 725.

## IV.

We have not previously had occasion to consider whether the Railway Labor Act circumscribes state power to regulate economic warfare between disputants subject to the Act. Read narrowly, the decisions cited above, at 379, do no more than negate the "implication" of an independent federal remedy against self-help,[14] and do not foreclose a State from bringing its own sanctions to bear on such conduct. On this theory, once the Act's required processes have been exhausted, a State would be free to impose whatever restrictions it wished on the parties' use of self-help.

The Act is silent on this question, as is its legislative history.[15] We think it clear, however, that the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes. The disputants' positions in the course of negotiation and mediation, and their willingness to submit to binding arbitration or abide by the recom-

---

[14] Cf., *e. g., Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192 (1944). See Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv. L. Rev. 285 (1963).

[15] What little relevant legislative history we have found, however, indicates that in opting for the voluntary settlement of railway labor disputes, Congress intended to limit state authority to impose the rejected compulsions. See 67 Cong. Rec. 4706–4707 (1926).

mendations of a presidential commission, would be seriously affected by the knowledge that after these procedures were exhausted a State would, say, prohibit the employees from striking or prevent the railroad from taking measures necessary to continue operating in the face of a strike. Such interference would be compounded if the disputants were—as they frequently would be—subjected to various and divergent state laws. Railway (and airline [16]) labor disputes typically present problems of national magnitude. A strike in one State often paralyzes transportation in an entire section of the United States, and transportation labor disputes frequently result in simultaneous work stoppages in many States.

The Railway Labor Act's entire scheme for the resolution of major disputes would become meaningless if the States could prohibit the parties from engaging in *any* self-help. And the potentials for conflict, see *San Diego Unions* v. *Garmon,* 359 U. S. 236, 249, 250 (1959) (concurring opinion), and for the imposition of inconsistent state obligations, cf. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943), are simply too great to allow each State which happens to gain personal jurisdiction over a party to a railroad labor dispute to decide for itself what economic self-help that party may or may not pursue. The determination of the permissible range of self-help "cannot be left to the laws of the many States, for it would be fatal to the goals of the Act" if conduct were prohibited by state laws "even though in furtherance of the federal scheme. The needs of the subject matter manifestly call for uniformity." *Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682, 691–692 (1963).

---

[16] Air carriers and their employees were made subject to the Railway Labor Act in 1936. 49 Stat. 1189, 45 U. S. C. §§ 181, 182.

It follows that even though the Florida courts may have jurisdiction over this litigation, the application of state law is limited by paramount federal policies of nationwide import.

## V.

We are presented, then, with the problem of delineating the area of labor combat protected [17] against infringement by the States. The text and legislative history of the Railway Labor Act, and the decisional law thereunder, provide little guidance. To refer to the "general" labor law, as it existed around the time the Act came into being, would be ahistorical. Like forays into economic due process, see *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488 (1955), this judge-made law of the late 19th and early 20th centuries was based on self-mesmerized views of economic and social theory, see F. Frankfurter & N. Green, The Labor Injunction 1–46, 199–205 (1930); A. Cox & D. Bok, Cases on Labor Law 101–105 (5th ed. 1962), and on statutory misconstruction, see *United States* v. *Hutcheson,* 312 U. S. 219 (1941). We need not hold that the Norris-LaGuardia Act applies directly to this case [18] to find in its enactment a clear disapproval

---

[17] In the context of labor relations law, this word is fraught with ambiguity. "Protected conduct" may, for example, refer to employee conduct which the States may not prohibit, see, *e. g., Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 474 (1955), or to conduct against which the employer may not retaliate, cf., *e. g., NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957). Throughout this opinion we use the word in the former sense only.

[18] The question whether the Norris-LaGuardia Act bars state courts from issuing labor injunctions was argued in a somewhat different context, but not decided, in *Avco Corp.* v. *Machinists,* 390 U. S. 557 (1968). It is argued here, but again we find no need to reach it.

of these free-wheeling judicial exercises. See *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 697, 700–709, 718 (1965) (separate opinion of Mr. Justice Goldberg).

To the extent that there exists today any relevant corpus of "national labor policy," it is in the law developed during the more than 30 years of administering our most comprehensive national labor scheme, the National Labor Relations Act. This Act represents the only existing congressional expression as to the permissible bounds of economic combat. It has, moreover, presented problems of federal-state relations analogous to those at bar. The Court has in the past referred to the NLRA for assistance in construing the Railway Labor Act, see, *e. g., Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 200–201 (1944); *Railroad Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50, 61, n. 18 (1944), and we do so again here. Indeed, even if we were to revive the "common law" of labor relations, the common law has always been dynamic and adaptable to changing times, and we would today look to these legislatively based principles for guidance. Cf. *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 456–457 (1957).

It should be emphasized from the outset, however, that the National Labor Relations Act cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes.[19] Cf. *Railroad Trainmen* v. *Chicago River &*

---

[19] For example, in referring to decisions holding state laws preempted by the NLRA, care must be taken to distinguish pre-emption based on federal protection of the conduct in question, *e. g., Teamsters* v. *Oliver*, 358 U. S. 283 (1959); *Bus Employees* v. *Wisconsin Employment Relations Board*, 340 U. S. 383 (1951), from that based predominantly on the primary jurisdiction of the National Labor Relations Board, *e. g., San Diego Unions* v. *Garmon*, 359 U. S. 236 (1959), although the two are often not easily separable. See *NLRB*

*I. R. Co.,* 353 U. S. 30, 31, n. 2 (1957). We refer to the NLRA's policies not in order to "apply" them to petitioners' conduct—for we conclude that this would be neither justified nor practicable—but only to determine whether it is within the general penumbra of conduct held protected under the Act or whether it is beyond the pale of any activity thought permissible.

In order to gain better perspective for viewing the central issue in this case—petitioners' alleged "secondary" activities—we examine first what we find to be polar examples of protected and unprotected conduct—primary strikes and picketing on the one hand, violence and intimidation on the other.

## VI.

The Court has indicated, without reference to the National Labor Relations Act, that employees subject to the Railway Labor Act enjoy the right to engage in primary strikes over major disputes. In *Railway Clerks* v. *Florida E. C. R. Co.,* 384 U. S. 238, 244 (1966), we held that:

"The unions, having made their demands and having exhausted all the procedures provided by Congress, were therefore warranted in striking. For the strike has been the ultimate sanction of the union, compulsory arbitration not being provided."

Similarly, in *Florida E. C. R. Co.* v. *Railroad Trainmen,* 336 F. 2d 172, 181 (1964), the Court of Appeals for the Fifth Circuit concluded that "when the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each [party]. On the side of labor, it is the cherished right to strike." Whether the source of this right be found in

v. *Insurance Agents,* 361 U. S. 477, 493–494, n. 23 (1960). There is, of course, no administrative agency equivalent to the NLRB with jurisdiction over railway labor disputes.

a particular provision of the Railway Labor Act[20] or in the scheme as a whole, it is integral to the Act. State courts may not enjoin a peaceful strike by covered railway employees, no matter how economically harmful the consequences may be. Cf. *Bus Employees* v. *Wisconsin Employment Relations Board,* 340 U. S. 383 (1951); *Automobile Workers* v. *O'Brien,* 339 U. S. 454 (1950).

The Court has consistently held peaceful primary picketing incident to a lawful strike to be protected conduct under the National Labor Relations Act. "Picketing has traditionally been a major weapon to implement the goals of a strike," *Steelworkers* v. *NLRB,* 376 U. S. 492, 499 (1964), and "it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing." *Garner* v. *Teamsters,* 346 U. S. 485, 500 (1953). We see no possible grounds for distinguishing picketing under the Railway Labor Act.

---

[20] Cf. § 2 Fourth, 48 Stat. 1187, 45 U. S. C. § 152 Fourth: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing." It has been suggested that this provision is "comparable" to § 7 of the NLRA, which grants employees the right to "self-organization" and the right to engage in "concerted activities . . . ," and which, even apart from § 13, protects the right to strike, see, *e. g., Bus Employees* v. *Wisconsin Employment Relations Board,* 340 U. S. 383, 389 (1951). Memorandum of Mar. 11, 1935, prepared for Senate Committee on Education and Labor comparing S. 1958 (74th Cong.) with S. 2926 (73d Cong.), 1 Legislative History of the National Labor Relations Act, 1935, at 1350–1351. However, § 2 Fourth of the RLA, added in 1934, was designed primarily, if not exclusively, to prohibit coercive employer practices. See H. R. Rep. No. 1944, 73d Cong., 2d Sess., 2 (1934); L. Lecht, Experience under Railway Labor Legislation, c. V (1955). The explicit language of § 7 of the NLRA was probably responsive to the difference between the "embryo organizations in the industries covered by" the NLRA, and the already "strongly organized" railway unions. Memorandum, *supra,* 1 Legislative History, *supra,* at 1329. For an indication of the economic power of railway labor organizations prior to enactment of the Railway Labor Act, see G. Eggert, Railroad Labor Disputes (1967).

Peaceful primary strikes and picketing incident thereto lie within the core of protected self-help under the Railway Labor Act.

On the other hand, the National Labor Relations Act gives no colorable protection to violent and coercive conduct incident to a labor dispute. *Allen-Bradley Local v. Wisconsin Employment Relations Board,* 315 U. S. 740, 750 (1942). The state interest in preventing "conduct marked by violence and imminent threats to public order" is compelling, *San Diego Unions v. Garmon,* 359 U. S. 236, 247 (1959), and such conduct may be enjoined by state courts. *Youngdahl v. Rainfair,* 355 U. S. 131 (1957); *Automobile Workers v. Wisconsin Employment Relations Board,* 351 U. S. 266 (1956). Cf. *Automobile Workers v. Russell,* 356 U. S. 634 (1958); *Construction Workers v. Laburnum Construction Corp.,* 347 U. S. 656 (1954). The federal concern for protecting such conduct when engaged in by railway employees is no less tenuous. The States' interest in preventing it is no less compelling.

## VII.

Petitioners committed no acts of violence. But their picketing, albeit peaceful, could not be characterized as purely "primary." Respondent asserts, in essence, that, because the picketing had secondary aspects, it was necessarily unprotected and therefore subject to proscription by the state court. The matter, however, is not so simply resolved.

No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of "secondary" conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating "pri-

mary" from "secondary" activities. See F. Frankfurter
& N. Green, The Labor Injunction 43–46, 170 (1930);
1 L. Teller, Labor Disputes and Collective Bargaining
§ 145 (1940); E. Oakes, Organized Labor and Industrial
Conflicts, § 407 *et seq.* (1927); Barnard & Graham, Labor
and the Secondary Boycott, 15 Wash. L. Rev. 137 (1940);
Hellerstein, Secondary Boycotts in Labor Disputes, 47
Yale L. J. 341 (1938). Cf. Aaron, Labor Injunctions in
the State Courts—Pt. I: A Survey, 50 Va. L. Rev. 950,
971–977 (1964). For these reasons, as well as those
stated above, at 382–383, this body of common law offers
no guidance for the problem at hand.

It was widely assumed that, prior to 1947, the Norris-
LaGuardia Act prevented federal courts from enjoining
any "secondary boycotts." See 93 Cong. Rec. 4198
(remarks of Senator Taft); *Bakery Drivers* v. *Wagshal,*
333 U. S. 437, 442 (1948). Indeed, in an opinion written
by Judge Learned Hand, the Court of Appeals for the
Second Circuit held that secondary conduct was fully
protected by the Wagner Act. *NLRB* v. *Peter Cailler
Kohler Swiss Chocolates Co.,* 130 F. 2d 503 (1942). The
1947 Taft-Hartley amendments, 61 Stat. 140, and the
1959 Landrum-Griffin amendments, 73 Stat. 545, explicitly
narrowed the scope of protected employee conduct under
the National Labor Relations Act; §§ 8 (b)(4) and 8 (e)
of the Act proscribed a variety of secondary activities.[21]
But Congress enacted "no . . . sweeping prohibition" of

---

[21] Petitioners contend that Senator Taft's statement, during the
congressional debates, that § 8 (b)(4) did not apply to persons
subject to the Railway Labor Act, *supra,* n. 10, necessarily entails
that the Railway Labor Act protects secondary conduct. But, except
under unusual circumstances, the NLRA in its entirety is inappli-
cable to such persons. Part II, *supra.* It would be inappropriate
to give any weight to these isolated passing remarks about one
statutory scheme made in the context of amending an entirely
different one.

secondary conduct. *Carpenters* v. *NLRB,* 357 U. S. 93, 98 (1958). And despite their relative precision of language,[22] the experience under these amendments amply demonstrates that—as at common law—bright lines cannot be drawn between "legitimate 'primary activity' and banned 'secondary activity' . . . ." *Electrical Workers* v. *NLRB,* 366 U. S. 667, 673 (1961).

The fuzziness of this distinction stems from the overlapping characteristics of the two opposing concepts, and from the vagueness of the concepts themselves. The protected primary strike "is aimed at applying economic pressure by halting the day-to-day operations of the struck employer," *Steelworkers* v. *NLRB,* 376 U. S. 492, 499 (1964); and protected primary picketing "has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt," *ibid.,* including other employers and their employees. "The gravamen of a secondary boycott," on the other hand, "is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." *Electrical Workers* v. *NLRB,* 181 F. 2d 34, 37 (1950); see also *Woodwork Manufacturers* v. *NLRB,* 386 U. S. 612, 623 (1967). These principles often come into conflict, and attempts to harmonize them in the context of § 8 (b)(4) of the National Labor Relations Act have created ramified sets of rules.

The problem of delineating the scope of permissible picketing at a "common situs"—a place, such as respondent's terminal, where both the struck employer and "sec-

---

[22] Section 8 (b)(4) "does not speak generally of secondary boycotts . . . [but] describes and condemns specific union conduct directed to specific objectives." *Carpenters* v. *NLRB, supra,* at 98.

ondary" or "neutral" employers are carrying on business activities—has been among the most mooted and complex under the Act. See generally *Electrical Workers* v. *NLRB*, 366 U. S. 667, 674–679 (1961); *Moore Dry Dock Co.*, 92 N. L. R. B. 547 (1950); Lesnick, The Gravamen of the Secondary Boycott, 62 Col. L. Rev. 1363 (1962); Koretz, Federal Regulation of Secondary Strikes and Boycotts—Another Chapter, 59 Col. L. Rev. 125 (1959). It is difficult to formulate many generalizations governing common situs picketing, but it is clear that secondary employers are not necessarily protected against picketing aimed directly at their employees. In *Electrical Workers* v. *NLRB, supra,* for example, we noted that striking employees could picket at a gate on the struck employer's premises which was reserved exclusively for employees of the secondary employer, to induce those employees to refuse to perform work for their employer which was connected with the struck employer's normal business operations. The Court affirmed this principle in *Steelworkers* v. *NLRB, supra,* where it held that striking employees could picket to induce a neutral railroad's employees to refuse to pick up and deliver cars for the struck employer—even though the picketed gate was owned by the railroad, and the railroad's employees would have to pass by the place of picketing to pick up and deliver cars for other plants that were not struck.

If the common situs rules were applied to the facts of this case—considering, for example, FEC's substantial regular business activities on the terminal premises, FEC's relationships with respondent and the other railroads using the premises,[23] the mixed use in fact of the

---

[23] Cf. also *Railroad Trainmen* v. *Atlantic C. L. R. Co.*, 362 F. 2d 649, 654–655 (1966); *NLRB* v. *Electrical Workers*, 228 F. 2d 553 (1955); *Douds* v. *Architects*, 75 F. Supp. 672 (1948).

purportedly separate entrances, and the terminal's characteristics which made it impossible for the pickets to single out and address only those secondary employees engaged in work connected with FEC's ordinary operations on the premises—the state injunction might well be found to forbid petitioners from engaging in conduct protected by the National Labor Relations Act. The fact that respondent, the other roads, or other industries in the State suffered serious economic injury as a consequence of petitioners' activities would not, of course, in itself render the picketing unlawful. *Woodwork Manufacturers* v. *NLRB*, 386 U. S. 612, 627 (1967); see *NLRB* v. *Fruit & Vegetable Packers,* 377 U. S. 58 (1964); cf. *Bus Employees* v. *Wisconsin Employment Relations Board,* 340 U. S. 383 (1951).

In short, to condemn all of the petitioners' picketing which carries any "secondary" implications would be to paint with much too broad a brush.

## VIII.

We have thus far concluded that although the Florida courts are not pre-empted of jurisdiction over this cause, Part II, *supra,* the issues therein are governed by federal law, Parts III, IV, *supra;* that the Railway Labor Act permits railway employees to engage in *some* forms of self-help, free from state interference, *ibid.;* and, drawing upon labor policies evinced by the National Labor Relations Act, Part V, *supra,* that such protected self-help includes peaceful "primary" strikes[24] and non-violent picketing in support thereof, Part VI, *supra,* and that it cannot categorically be said that *all* picketing carrying "secondary" implications is prohibited, Part VII, *supra.* Given these conclusions, it remains to be con-

---

[24] The right to strike finds support, not only in analogy to the NLRA, but in the history of, and decisions under, the Railway Labor Act itself. *Supra,* at 379–380, 384.

sidered whether, under the present framework of congressional legislation, this Court should undertake precisely to mark out which of the petitioners' picketing activities at respondent's premises are federally protected, and therefore immune from state interference, and which of them are subject to prohibition by the State. We believe that such a course would be a wholly inappropriate one for us to take in the absence of a much clearer manifestation of congressional policy than is to be found in existing laws.

Certainly we could not proceed to such a task under the common law of labor relations. For even on the unjustified hypothesis that all secondary conduct is necessarily wrongful, we would lack meaningful standards for separating primary from secondary activities. Nor do the terms of the Railway Labor Act offer assistance. As we have indicated, the Act is wholly inexplicit as to the scope of allowable self-help.

Nor can we properly dispose of this case simply by undertaking to determine to what precise extent petitioners' picketing activities would be protected or proscribed under the terms of the National Labor Relations Act. For although, in the absence of any other viable guidelines, we have resorted to the NLRA for assistance in mapping out very general boundaries of self-help under the Railway Labor Act, there is absolutely no warrant for incorporating into that Act the panoply of detailed law developed by the National Labor Relations Board and courts under § 8 (b)(4). The NLRA, as we have noted, exempts employees who are subject to the Railway Labor Act, *supra*, at 376–377; and the inapplicability of § 8 (b) to railroad employees was specifically pointed out during the congressional debates on the NLRA, *supra*, at 376–377, n. 10.

Even if the task of adapting the NLRA's principles to railway disputes could be managed and implemented

by an agency with administrative expertise, but cf. *NLRB* v. *Insurance Agents,* 361 U. S. 477, 497–498 (1960), Congress has invested no agency with even colorable authority to perform this function. The very complexity of the distinctions examined in Part VII, *supra,* if nothing else, plainly demonstrates that we lack the expertise and competence to undertake this task ourselves.

Moreover, "[f]rom the point of view of industrial relations our railroads are largely a thing apart. . . . 'The railroad world is like a state within a state.' " *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 751 (1945) (Frankfurter, J., dissenting). Thus, if Congress should now find that abuses in the nature of secondary activities have arisen in the railroad industry, see *supra,* at 376–377, n. 10, it might well decide—as it did when it considered the garment and construction industries, see NLRA § 8 (e)—that this field requires extraordinary treatment of some sort. Cf., *e. g., Railroad Trainmen* v. *Atlantic C. L. R. Co.,* 362 F. 2d 649, 654–655 (1966). Certainly, it is for the Congress, and not the courts, to strike the balance "between the uncontrolled power of management and labor to further their respective interests." *Carpenters* v. *NLRB,* 357 U. S. 93, 100 (1958); see *Woodwork Manufacturers* v. *NLRB,* 386 U. S. 612 (1967); *id.,* at 648–650 (separate memorandum). The Congress has not yet done so.

In short, we have been furnished by Congress neither usable standards nor access to administrative expertise in a situation where both are required. In these circumstances there is no really satisfactory judicial solution to the problem at hand. However, we conclude that the least unsatisfactory one is to allow parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute to employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law. Hence, until Con-

gress acts, picketing—whether characterized as primary or secondary—must be deemed conduct protected against state proscription.[25]  Cf. *Electrical Workers* v. *NLRB,* 122 U. S. App. D. C. 8, 9–10, 350 F. 2d 791, 792–793 (1965) (dissenting opinion); *NLRB* v. *Peter Cailler Kohler Swiss Chocolates Co.,* 130 F. 2d 503 (1942).  Any other solution—apart from the rejected one of holding that *no* conduct is protected—would involve the courts once again in a venture for which they are institutionally unsuited.

The judgment of the Florida District Court of Appeal is accordingly

*Reversed.*

MR. JUSTICE FORTAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE STEWART concur, dissenting.

Respondent provides terminal facilities for four railroads at Jacksonville, Florida.  Petitioners have a long-standing labor dispute with one of those carriers, Florida East Coast.  They have established a picket line, manned by employees of FEC but established at all entrances and exits to the Terminal and not restricted to the single entrance designated[1] for use by FEC employees.  The conceded purpose of the picketing was to

---

[25] Our holding is, of course, limited to disputes subject to the Railway Labor Act, and in no way detracts from the power of the States to regulate labor conduct not otherwise governed by a paramount federal scheme.  Cf. *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490 (1949).

[1] When the strike started on January 23, 1963, respondent designated a special gate for the exclusive use of FEC employees who report to work at the Terminal.

The strike originally involved only nonoperating employees of FEC.  But in 1966 the operating unions also went on strike against FEC.

cause respondent and the other three carriers not to interchange traffic with FEC.

Petitioner Brotherhood of Railroad Trainmen, however, has no labor dispute with any carrier using the Terminal except FEC. The Florida court found that the pattern of picketing being used "would result in a virtual cessation of activities not only of the Terminal Company but also of numerous industries in Duval County and . . . Florida."

The order entered [2] barred all picketing by FEC employees except at the designated single entrance. The trial court relied, *inter alia,* on the ground that "[t]he past and threatened picketing seeks to coerce plaintiff [respondent] into embargoing the FEC in violation of the Restraint of Trade Laws of this State." The laws referred to are Fla. Stat. § 542.01 *et seq.* which set up a broad regulatory scheme banning "a combination of capital, skill or acts by two or more persons" to "create or carry out restrictions in trade or commerce." The District Court of Appeal, in affirming the trial court in the present case, said that it "exercised a proper authority in enjoining a violation of a valid state statute." 201 So. 2d 253, 254.

The question therefore is whether Florida may ban picketing [3] in support of a secondary boycott.

---

[2] We were asked to review a temporary injunction issued by the trial court. See 385 U. S. 935. The permanent injunction, now here, was affirmed *per curiam* by the District Court of Appeal, 201 So. 2d 253, and the Florida Supreme Court dismissed an appeal and denied certiorari.

[3] The picketing was first enjoined by the Federal District Court in a proceeding brought by two carriers (other than FEC) and the Terminal Company. That judgment was reversed by the Court of Appeals which held that the requirements of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 *et seq.* had not been met. 362 F. 2d 649.

We affirmed the Court of Appeals by an equally divided Court. 385 U. S. 20.

Congress could pre-empt this field of picketing any rail carrier for purposes of a secondary boycott as our rail carriers and their labor problems are conspicuously within reach of the Commerce Clause. Congress in the Labor Management Relations Act of 1947, 29 U. S. C. § 141 *et seq.* did legislate on secondary boycotts.[4] 29 U. S. C. § 158 (b)(4)(i)(B). But it expressly excluded from that regulatory scheme [5] "any person subject to the Railway Labor Act," § 152 (2), and any individual employed by such person, § 152 (3).

We are therefore in an area where Congress has not legislated and, as I see it, the case is controlled by *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490.

In *Giboney,* Missouri applied its anti-trade-restraint law to enjoin a union from picketing employers to enforce a secondary boycott. We stated that the basic issue was "whether Missouri or a labor union has paramount constitutional power to regulate and govern the manner in which certain trade practices shall be carried on" in Missouri. *Id.,* at 504. A State's power over secondary boycotts was held to be paramount; and that is what we should hold today, since Congress has not pre-empted the subject.

It is suggested that there is an hiatus which this Court should fill. To do so, we would have to fill in large gaps between the Railway Labor Act, 45 U. S. C. § 151 *et seq.,* and many other specialized Acts of Congress that touch on pieces of the problems of labor in the railroad field. Once the remedies provided in the Railway Labor Act are exhausted, federal administrative remedies are at an end. No authority is empowered to settle the dispute;

---

[4] See, *e. g., NLRB* v. *Rice Milling Co.,* 341 U. S. 665; *Electrical Workers* v. *NLRB,* 366 U. S. 667; *Steelworkers* v. *NLRB,* 376 U. S. 492.

[5] See S. Rep. No. 105, 80th Cong., 1st Sess., 19; *Teamsters Union* v. *New York, N. H. & H. R. Co.,* 350 U. S. 155, 159–160.

no compulsory arbitration is provided. The conditions of work may be as bad as the employees suffer them to be and made as good as they can agree upon through bargaining. When the various procedures established by the Act are exhausted, "both parties . . . are relegated to self-help in adjusting" the dispute. *Locomotive Engineers* v. *Baltimore & O. R. Co.,* 372 U. S. 284, 291.

Legislating interstitially is one thing; judicial insertion into our federal railway labor law of rules governing secondary boycotts is formulation of national policy in the raw. Whether it should be done and, if so, how, are matters for the Senate and the House.

The effort of the Court to find support for this secondary boycott in federal law is a masterful endeavor. The opinion is indeed a brilliant brief for a federal law to support the struggle of petitioners to end the ugly conflict. The difficulty is that no matter how carefully federal law is examined no express sanction for what petitioners can do can be found. Federal authority for what they do rests on the thinnest of inferences and yet that inference is brought under the Supremacy Clause.

Article VI of the Constitution states that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ." But one looks in vain for any federal "law" that collides with state law or that can be said to pre-empt state law. Federal law says that when the parties exhaust their remedies under the Railway Labor Act they may resort to "self-help"—not a congressional phrase but a judicial gloss put on the Act. *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 725. But it is strong medicine to say that their right to "self-help" overrides state law. Certainly it does not when violence is used to injure people and destroy property. *Allen-*

*Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740. For then the States have an arsenal of authority to deal with the situation. Why is that power greater than the power to protect the economy of the area? We have a finding that, if the conduct which the Court authorizes continues, there will be serious injury to "numerous industries in Duval County"—industries that have no responsibility for the labor dispute.

The question, says the Court, is whether "the States could prohibit the parties from engaging in *any* self-help." If that is true, then the Act's scheme would be impaired. But that is not the issue. It is whether the State can prevent a secondary boycott which threatens to paralyze a whole community. If a State cannot fill that hiatus in a federal scheme, then much law will have to be unlearned.

States' rights are often used as a cloak to cover unconstitutional encroachments such as the maintenance of second-class citizenship for Negroes or Americans of Mexican ancestry. But a state policy to confine an industrial dispute to the parties and, if possible, not to let it paralyze the entire community cannot be put in that category.

Congress in adopting a federal regulation can make it exclusive of all state regulation, in which event one may not be required "by a State to do more or additional things or conform to added regulations, even though they in no way conflicted with what was demanded of him under the Federal Act." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 236. And see *Campbell* v. *Hussey,* 368 U. S. 297, 300–301. But that principle, though uniformly recognized, has provoked much dissent in its application, as the dissents in the *Rice* and *Campbell* cases illustrate.

As Mr. Justice Brandeis said in *Napier* v. *Atlantic Coast Line*, 272 U. S. 605, 611, "The intention of Congress to exclude States from exerting their police power must be clearly manifested." And the Court, mindful of the force of the Tenth Amendment and the place of the States in our constitutional system, has resolved close cases in favor of a continuing power on the part of the States to legislate in their customary fields and thus has permitted state regulations to mesh with federal controls. See *Federal Compress Co.* v. *McLean*, 291 U. S. 17; *Townsend* v. *Yeomans*, 301 U. S. 441, 454; *Penn Dairies* v. *Milk Control Commission*, 318 U. S. 261.

Even here, there have been dissents when it came to particular applications of the principle to the facts of a case. But I venture that in no case prior to today's decision has a State been barred from legislating in a field which is not specifically touched by the federal regulation and which remains after the federal remedies have spent themselves and proved to be of no avail.

The States should be allowed a free hand in labor controversies except and unless Congress has adopted a contrary policy. We search in vain for any such federal law in this context.

I would affirm the judgment.