**UNITED TRANSPORTATION UNION, LOCAL 63E, Plaintiff-Appellee,**

v.

**PENN CENTRAL COMPANY, Defendant-Appellant.**

No. 20572.

United States Court of Appeals, Sixth Circuit.

May 27, 1971.

EDWARDS, Circuit Judge.

This is an appeal by defendant-appellant Penn Central Company from an order of a District Judge in the United States District Court for the Northern District of Ohio which granted an injunction restraining the railroad from substituting computer prepared "print outs" of employees' work schedules instead of mechanical "crew boards."

The sole question posed by this appeal, as we see it, is whether or not Penn Central's unilateral change from "crew boards" to "print outs" as a method of informing their employees of work availability created a major dispute within the meaning of the Railway Labor Act. The District Judge held that the dispute was a "major" one. He found:

> "The evidence does not reveal a mere dispute over the meaning of the language in the contract, for it clearly shows that the defendant's print-outs are not just another form of crew board. They are not what a crew board is, and they do not do what a crew board does. Consequently, the dispute between the parties is not a minor one, but concerns an attempt by the defendant to change the very terms of the contract. Defendant's actions amount to a change in working conditions, and create a major dispute."

The District Judge ordered that the injunction remain in full force until "such time as the parties have exhausted all the remedies available to them or either of them under the Railway Labor Act."

Hermon M. Wells, Philadelphia, Pa., for defendant-appellant; Robert B. Gosline, Carl V. Bruggeman, Shumaker, Loop & Kendrick, Toledo, Ohio, of counsel.

Thomas J. Murray, Jr., Sandusky, Ohio, for plaintiff-appellee; Murray & Murray, Sandusky, Ohio, on brief.

Before WEICK and EDWARDS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

The labor-management agreement between these two contesting parties provided in part:

> "Crew boards (h). Crew boards showing the order in which crews are to go out will be maintained. Boards of regular and extra hostlers will also be maintained."

For 75 years the company maintained mechanical crew boards, which consisted of a large pegboard and colored pegs.

These boards served to inform workers at a brief glance when they would be called for work, what their order was, what openings were available and when. The company decided to alter this operation and move it to a central office (six miles away and not accessible to employees). There employing a board of a very similar nature (but employing colored cards in place of pegs) a scheduler would plot any crew changes and feed the information into a computer. The company then posted "print outs" drawn from the computer three times a day. The print outs are typewritten 8″ x 14″ pieces of paper. Usually six or eight pages were posted at one time.

Penn Central's position is that the print outs represented a permissible and acceptable form of "crew boards" within the meaning of the agreement, that they provided the employees with the same information, and that in any event, the District Judge was completely without authority to issue his injunction, whether the dispute was major or minor, and whether it did or did not apply to contract interpretation.

The union's[1] position, on the other hand, is that the crew boards were central to the entire employment operation, that they were relied upon heavily by employees in determining the time off which they had available for rest and recreation and family duties, that the new system could not be termed a crew board under any stretch of the imagination, that in fact this was a unilateral alteration of a working condition prohibited by the Railway Labor Act, and that under Brotherhood of Railway Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), and other cases, the District Judge had ample authority to issue the injunction which he issued.

It is clear that the union objected repeatedly (both before and after the change) to substitution of the print outs for the crew boards. The union also filed a section 6 notice under 45 U.S.C. § 156. It is also clear that the company proceeded to abolish the old crew boards and substitute the print outs without advance notice or conference, as called for in the same statute.

A general status quo provision is contained in 45 U.S.C. § 152(7) (1964):

> "*Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden*
>
> "Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

The major dispute provision invoked by the union provides:

> "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or *working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board,* unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board." 45 U.S.C. § 156 (1964). (Emphasis added.)

In the *Railroad Trainmen* case, Justice Harlan supplied this succinct sum-

---

I.  United Transportation Union, Local 63E.

mary of the provisions of the Railway Labor Act which we believe to be applicable here:

"The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. *While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.*" (Emphasis added). Brotherhood of Railway Trainmen v. Jacksonville Terminal Co., *supra* at 378, 89 S.Ct. at 1115.

Subsequently Justice Black added this comment on the status quo requirement:

"The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. More-over, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

"There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6, the section of immediate concern in this case, provides that 'rates of pay, rules, or working conditions shall not be altered' during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5 First provides that for 30 days following the closing of Mediation Board proceedings 'no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose,' unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, 'no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose.' These provisions must be read in conjunction with implicit status quo requirement in the obligation imposed upon both parties by § 2 First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce." (Footnotes omitted.) Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 150–151, 90 S.Ct. 294, 299–300, 24 L.Ed.2d 325 (1969).

■ Thus we believe that it is settled law that the unilateral changing of "working conditions" is prohibited by

the Railway Labor Act without full compliance with its terms.

What has been said thus far does not, however, dispose of the question as to whether factually what is involved in this dispute is a unilateral change of a "working condition."

On this issue the District Judge held:

"There can be no doubt, however, that the contract requires the defendant to maintain crew boards, and its failure or refusal to do so would clearly amount to a change in the conditions of the contract, which this Court his jurisdiction to enjoin in order to preserve the status quo until the procedures provided for resolution of the dispute have been exhausted.

"The evidence clearly showed several things, some of which are merely matters of background, and others of which bear heavily on the determination of the dispute. Among the background matters are the fact that the plaintiff's members never relied exclusively upon the crew boards for information, but were accustomed to call the dispatcher to get it, and the fact that a great many more serious errors in work assignments have occurred since the crew boards have been replaced by the print-outs.

"Some other matters shown in the evidence, however, are of importance in resolving the dispute.

"It clearly appears that it is far more difficult to obtain information from the print-outs as they were shown in evidence than from the mechanical crew board. The whole working situation may be taken in by a moment's study of the crew board, and that without blocking or impeding others who are simultaneously seeking information. The print-outs can be read only by one individual at a time, and since there are some six to ten pages of typewritten information to be examined, that one individual must spend several minutes in the examination.

"A corollary to this difficulty is that vacancies which appear on the crew board as a conspicuous red plug appear on the print-out merely as three X's in the same size and color of type as everything else on the page.

"Another corollary to this difficulty is that the detection from the print-outs of various errors in assignments which can and do occur is difficult almost to the point of impossibility. If by chance a crewman learns that an error in assignments has been made to his detriment a considerable amount of meticulous reading of the print-out is required to demonstrate it.

"Perhaps the most important demonstrated difference between the crew boards and the print-outs is in the matter of timeliness. The print-outs are posted three times a day, and reflect the status of assignments and priorities at the time they are prepared. During the succeeding eight hours, numerous changes occur, but they cannot appear on the print-out until the next one is issued. Since each succeeding print-out reflects only the situation at the moment it is prepared, interim changes may not appear on the print-out at all, and a print-out may be, and often is, invalid and inaccurate as a source of information as the exact moment it is posted.

"The evidence finally disclosed that the information which is contained in the print-outs is compiled by the use of cards which are fed into a machine shortly before the time for posting the print-outs. Except for the short time that these cards are in the machine, the cards are kept in a rack, which is accessible only to the dispatchers. The cards are color-coded, and the combination of cards and rack is very similar to the discontinued mechanical crew boards. The cards and rack are handled as the crew boards were handled, by changing the positions of the cards immediately upon the occurrence of any change in the work situation. When one of plaintiff's members telephones the dispatcher for information

as to his current work status, the dispatcher does not make reference to the print-out, but to the rack of cards.

"The evidence impels irresistibly to the conclusion that the posting of print-outs three times daily is not equivalent to maintaining a crew board as required by the agreement between the parties. This is not to say that the old hand-operated crew boards may not be replaced by crew boards which are operated automatically or electronically. However, the essential features of high visibility and accurate reflection of the current situation must characterize any replacement so long as the contract requires crew boards to be maintained.

"The evidence does not reveal a mere dispute over the meaning of the language in the contract, for it clearly shows that the defendant's print-outs are not just another form of crew board. They are not what a crew board is, and they do not do what a crew board does. Consequently, the dispute between the parties is not a minor one, but concerns an attempt by the defendant to change the very terms of the contract. Defendant's actions amount to a change in working conditions, and create a major dispute."

We have read the transcript of evidence in this case and find ample support for the view of the facts set forth above from the opinion of the District Judge.

■ Like the District Judge, we believe that appellant's change from "crew boards" to "print outs" was a unilateral change of working conditions prohibited by 45 U.S.C. § 156 except in compliance with the terms thereof. Further, the District Judge clearly considered and in our view properly rejected appellant's contentions that what was involved herein was a mere dispute over contract interpretation. *Cf.* Airlines Stewards & Stewardesses Assoc., Local 550 v. Caribbean Atlantic Airlines, Inc., 412 F.2d 289 (1st Cir. 1969); Southern Railway

Co. v. Brotherhood of Locomotive Firemen & Enginemen, 127 U.S.App.D.C. 371, 384 F.2d 323 (1967).

This case has many parallel aspects to the *Shore Line* case where under somewhat more difficult facts the United States Supreme Court recently held that this same District Court had jurisdiction to enter an injunction to maintain the status quo pending mediation. Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U. S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

The judgment of the District Court is affirmed.

