**MARRIOTT IN–FLITE SERVICES, a Division of Marriott Corporation, Plaintiff,**

v.

**LOCAL 504, AIR TRANSPORT DIVISION, TRANSPORT WORKERS OF AMERICA, AFL–CIO, Defendant.**

**No. 73 C 1380.**

United States District Court, E. D. New York.

Aug. 19, 1976.

Jackson, Lewis, Schnitzler & Krupman, New York City, for plaintiff; James R. Williams, New York City, of counsel.

Wallace & O'Haire, P. C., Hicksville, N. Y., for defendant; Andrew J. Wallace, Hicksville, N. Y., of counsel.

## MEMORANDUM AND ORDER

PRATT, District Judge.

In this action for damages arising out of secondary picketing activities, defendant union moves for summary judgment.

### THE FACTS

KLM Royal Dutch Airlines, not a party to this action, operated a commissary at John F. Kennedy International Airport, from which it supplied food for its own flights leaving JFK. KLM's employees in the commissary were members of defendant union, which together with its international (Transport Workers of America) were the recognized bargaining agents for those employees.

During renegotiations for several bargaining agreements which were due to expire on October 31, 1972, KLM announced its intention to close the commissary operation permanently. The union's opposition to this decision created a stumbling block to renegotiation of further contracts between KLM and the union. As a result, the union membership authorized a strike on October 27, 1972.

During the subsequent six month "cooling-off" period invoked by the National Mediation Board pursuant to the Railway Labor Act, 45 U.S.C. § 151 et seq. (which applies not only to railroads but also to air carriers such as KLM) both sides remained adamant in their positions on the prospective closing of the commissary. At the end of the "cooling-off" period in June, 1973, KLM permanently closed down the commissary and terminated its employees who had worked there.

In late June, 1973, KLM contracted with plaintiff Marriott for the latter to provide the food service for KLM's flights out of JFK. At the same time KLM assigned to Marriott its leasehold interest in the commissary building effective July 15, 1973. In effect, KLM thus shifted its food service from its own employees to an independent contractor.

In response to the commissary closing and employee termination, all members of Local 504 who were KLM employees struck on July 1, 1973. The commissary facility and other KLM buildings were picketed for a two month period, during which alleged acts of damage and destruction occurred to the commissary. It is these acts, claimed by Marriott to have been done by defendant union as part of secondary picketing proscribed by statute, which give rise to the instant suit.

On September 7, 1973, the strike ended and the union members returned to work. KLM offered substitute positions to all of its former commissary employees. Some of them accepted the offer and were relocated; others pursued arbitration procedures against KLM to remedy their situation.

### THE ACTION

Marriott brought this action, alleging that during the strike the union had violated the secondary picketing provisions of the

Labor Management Relations Act (LMRA).[1] The means claimed to have been used by the union were both direct acts against Marriott and attempts to coerce others to cease doing business with Marriott. Marriott also claims compensatory and punitive damages for the union's alleged destruction of Marriott's property, for tortious interference with Marriott's business and contractual rights, and from Marriott's resulting loss of business and profits.

## THE MOTION

The union has moved for summary judgment on two grounds. It claims first, that this court lacks subject matter jurisdiction over the defendant because the latter is exempt from the provisions of the LMRA, being covered instead by the Railway Labor Act (RLA).[2] Second, the union argues that even if the LMRA applies to it, the activities in which the union engaged were on the admitted facts not prohibited by law because Marriott was not a "neutral" in the union's dispute with its employer, KLM.

## DISCUSSION

The threshold issue, which is dispositive here, is whether the court has jurisdiction to entertain this action under 29 U.S.C. § 158(b)(4), which prohibits certain activities such as secondary picketing by "a labor organization or its agents". The key question is: can the defendant union be considered a "labor organization" as that term is defined in the LMRA? As appears below, this jurisdictional question must be answered in the negative, and the complaint must be dismissed.

1. 29 U.S.C. §§ 151, 158(b)(4)(i) and 158(b)(4)(ii)(B), and 187(a).

2. 45 U.S.C. § 151 et seq.

3. 29 U.S.C. § 152(5) provides in relevant part:
"(5) the term 'labor organization' means any organization of any kind * * * in which *employees* participate and which exists for the purpose, in whole or in part, of dealing with *employers* concerning grievances, labor disputes * * *." (emphasis supplied).

4. 29 U.S.C. § 152(3) provides in relevant part:

The LMRA, under which plaintiff seeks relief, defines a "labor organization" in terms of its function as between "employees" and "employers". 29 U.S.C. § 152(5).[3] Since air carriers and their employees are subject to the RLA, 45 U.S.C. §§ 181, 182, employees of KLM are expressly excluded from the LMRA's definition of "employee". 29 U.S.C. § 152(3).[4] Thus, the LMRA clearly would exclude the defendant from the classification of a "labor organization" if the defendant's members are individuals "employed by an employer subject to the RLA".

In opposition to the foregoing, Marriott argues that a congressional amendment to the secondary activities restrictions of the LMRA has extended their application to include both employers and employees who are also subject to the RLA. Prior to 1959, the LMRA prohibited a "labor organization or its agents" from engaging in secondary activities designed to influence "employees of an employer".

"It shall be an unfair labor practice for *a labor organization or its agents* * * to engage in, or to induce or encourage the *employees of any employer* to engage in, a strike or a concerted refusal in the course of their employment * * *." Act of June 23, 1947, ch. 120, Title I, § 101, 61 Stat. 140 (emphasis supplied).

Because the LMRA defined employer and employee as excluding those who were subject to the RLA, this section meant, prior to 1959, that there was no prohibition of secondary activities when done either by an organization of RLA employees or against an RLA employer.

"(3) the term 'employee' shall include any employee * * * but shall not include * * * any individual employed by an employer subject to the Railway Labor Act * * *."

There is a parallel definition of employer which reads:
"(2) the term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include * * * any person subject to the Railway Labor Act * * *."

Then, in 1959, Congress amended the LMRA by changing "employees of an employer" to read "any individual employed by any person". In practical effect this amendment expanded the class of persons protected by the act to include, among others, the previously exempt RLA employers and their employees. But there was no change in the statutory language which would include RLA employee unions in the classification of a "labor organization or its agents".

■ True, the legislative history of the 1959 amendment indicates a congressional intent that all parties subject to the RLA, both the acting employees and the passive employer, were now to be subject to the secondary activity restrictions of the LMRA:

"Under the definition section of the Taft-Hartley Act railroad employees, agricultural workers and government employees are not employees within the meaning of the act. The Board [NLRB] has reached the conclusion that secondary boycotts by these exempt categories, and the inducement of such boycotts are not unfair labor practices. . . . Secondary boycotts *by these groups* are just as much against the public interest as boycotts by anyone else. *The bill * * * would extend the ban to these excluded categories by use of the words 'any person' instead of the use of the words 'employees of any employer' in section [158(b)(4)]."* 1959 U.S.Code Cong. and Admin. News, pp. 2318, 2384 (emphasis supplied).

However, the statutory change in language was inadequate to accomplish this asserted intention, since the amendment left the statute's definition of a "labor organization" intact, using the old references to "employer" and "employee", which still excluded those who were subject to the RLA.

Thus, a plain reading of the statute indicates that while Congress extended the *protections* of § 158(b)(4) to all employers, even those under the RLA, it made no concomi-

tant extension of the *prohibitions* to encompass RLA employees.

■ In footnote 10 to *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), the Supreme Court similarly interpreted the statute:

"In 1959, [Section 158(b)(4)] was amended to expand the class of persons protected against secondary pressures. However, the amendment did not expand the scope of 'employees' or 'labor organizations' whom the Act forbad to engage in such conduct." 394 U.S. at 377, 89 S.Ct. at 1114 (citations omitted).

In another matter involving this same plaintiff the National Labor Relations Board concluded that an airline and its employees were subject to the ban on "hot cargo" agreements contained in the LMRA, 29 U.S.C. § 158(e). As part of its decision, the Board stated that Congress had intended § 158(b)(4) to apply to parties other than those who were simply "employers" within the meaning of the LMRA; in short, the Board found that the airline employees there could be prohibited from engaging in secondary activities. *International Association of Machinists and Aerospace Workers and Lufthansa German Airlines and Marriott In-Flite Services*, 197 N.L.R.B. 232, 237–38 (1972).

On review, the Ninth Circuit noted that 88% of the union's members were "employees" within the meaning of § 152(3) (i. e., they were not RLA employees), that more that 96% of the union's collective bargaining agreements were with non-RLA "employers", and that the challenged agreement itself was unrelated to RLA activities. On those facts, the Board had concluded, and the Ninth Circuit affirmed, that the union there was, indeed, a "labor organization" within the meaning of the LMRA. *Marriott v. NLRB,* 491 F.2d 367 (CA9 1974).

In practical effect, the court held that when involved with a non-RLA activity, a union which had only 12% RLA employees and 4% RLA collective bargaining agreements had insufficient connection with the RLA to exclude it from the LMRA's defini-

tion of "labor organization". In the present case, however, the undisputed facts do not warrant a similar finding. Defendant asserts, without opposition, that its total membership is 7,600, of whom only 1,000 are employed by non-RLA employers. Thus, approximately 86% of the defendant's membership are RLA employees, exactly the reverse of the situation in *Marriott v. NLRB, supra*. Moreover, the controversy giving rise to the contested activity here grew directly out of a dispute between KLM (an RLA employer) with its own employees, who are, therefore, RLA employees. Under these circumstances, it would be impossible to find, as did the Board in *Marriott v. NLRB, supra,* that the union here was a "labor organization" within the meaning of the LMRA.

If the LMRA's restriction against secondary activities is to be extended to prohibit such actions by unions of RLA employees, further action by Congress would be required. But in the seven years since the Supreme Court highlighted the one-sidedness of the 1959 amendment in *Brotherhood of Railroad Trainmen, supra,* Congress has failed to take the necessary corrective action, a fact which argues strongly that Congress never intended such an extension.

In short, plaintiff may not maintain this action for damages under 29 U.S.C. § 158(b)(4) against defendant union when 86% of its members are employees of RLA employers, and the primary labor dispute was with an RLA employer. Accordingly, the action must be dismissed for lack of subject matter jurisdiction.

In view of the foregoing, it is unnecessary to consider the other arguments raised by the parties. Defendant's motion for summary judgment dismissing the complaint is granted, and the complaint is dismissed.

SO ORDERED.