**MARRIOTT IN–FLITE SERVICES, a Division of Marriott Corporation, Appellant,**

v.

**LOCAL 504, AIR TRANSPORT DIVISION, TRANSPORT WORKERS OF AMERICA, AFL–CIO, Appellee.**

No. 719, Docket 76–7466.

United States Court of Appeals, Second Circuit.

Argued March 25, 1977.

Decided May 24, 1977.

Ivan H. Rich, Jr., Washington, D. C., for appellant.

Andrew J. Wallace, Hicksville, N. Y. (Wallace & O'Haire, Hicksville, N. Y., of counsel), for appellee.

Before ANDERSON and MESKILL, Circuit Judges, and MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.*

MESKILL, Circuit Judge:

This case provides a graphic reminder of Mr. Justice Frankfurter's admonition that the process of statutory construction cannot be reduced to "[t]he precision of a syllogism." [1]

The case was begun in the Eastern District of New York by an employer seeking damages against a union for alleged unfair labor practices, as provided for in § 303(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 187(b). The sole question presented on this appeal is whether a union organized under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq., is a "labor organization" subject to the secondary boycott provisions of NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). A literal reading of the cross references of the NLRA suggests that it is not, although the legislative history is clearly to the contrary. The district court held that the statute was clear on its face, and dismissed the complaint. 418 F.Supp. 609 (E.D.N.Y. 1976). We reverse.

I.

This case has its origins in a labor dispute between KLM Royal Dutch Airlines ("KLM") and its employees who are represented by Local 504 of the Transport Workers of America ("Local 504"). The labor relations of KLM and Local 504 were, and are, governed by the RLA.[2] Prior to 1972, KLM prepared meals for its flights at its

---

* Hon. Howard T. Markey, sitting by designation.

1. F. Frankfurter, "The Reading of Statutes" in Of Law and Men, 44, 67–68 (P. Elman ed. 1956).

2. The labor relations of airlines are governed by the Railway Labor Act, 45 U.S.C. § 181.

commissary at Kennedy Airport. During contract negotiations that year, KLM announced its intention to close the commissary and hire an independent contractor to prepare its meals. The bargaining reached an impasse, and Local 504 began a strike on October 27, 1972.

The National Mediation Board invoked the six-month "cooling off" period of the RLA, but the parties were unable to resolve their dispute. When the period ended in June, 1973, KLM dismissed all the commissary employees, and the strike resumed.

The sub-contractor chosen by KLM was Marriott In-Flite Services ("Marriott"). In addition to supplying meals for KLM flights, Marriott took over the KLM commissary.[3] The striking employees picketed there, allegedly preventing its use. Marriott then began this lawsuit in the Eastern District of New York, contending that Local 504's actions constituted illegal secondary picketing.

## II.

Before 1959, the NLRA did not ban secondary boycotts by RLA unions. The predecessor of § 8(b)(4)(B) then read:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9.

61 Stat. 141 (1947).

The National Labor Relations Board concluded that secondary activities by Railway Labor Act Unions were not covered under this section, because of the definitions of "employer," "employee" and "labor organization". *See, e. g., International Bro. of Teamsters*, 84 NLRB 360, 361 (1949).

"Labor organization" is defined in 29 U.S.C. § 152(5), which reads as follows:

The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

"Employer" and "employee" are themselves defined in 29 U.S.C. §§ 152(2), (3), as follows:

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include . . . any person subject to the Railway Labor Act, as amended from time to time . . . .

(3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise . . . but shall not include . . . any individual employed by an employer subject to the Railway Labor Act, as amended from time to time . . . .

---

**3.** It is not clear whether or not the facility was to be used to prepare meals for KLM, or if it is now being used for this purpose.

By tracing the cross-references of the NLRA, the basis for the exemption of RLA unions was clear. A railroad or airline was not an "employer" within the meaning of § 2(2), and RLA workers were not "employees" within the meaning of § 2(3). A union of RLA workers, therefore, was not a "labor organization" within § 2(5). Because the ban of § 8(b) applies only to "labor organizations," such a union was free to engage in secondary activity forbidden to an NLRA union.[4]

## III.

When Congress passed the Landrum-Griffin amendments to the NLRA in 1959, it was aware of this exemption and sought to change it. Section 8(b)(4)(B) was amended to read as follows:

(b) It shall be an unfair labor practice for a labor organization or its agents—

.     .     .     .     .

(4)(i) to engage in, or to induce or encourage *any individual employed by any person engaged in commerce or in an industry affecting commerce* to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain *any person engaged in commerce or in an industry affecting commerce*, where in either case an object thereof is—

.     .     .     .     .

(B) forcing or requiring *any person* to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified

as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (b) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

(Emphasis added).

The parties agree, as the district court concluded, that the legislative intent to bring RLA unions within the secondary boycott ban by making the italicized changes is unequivocal. For example, the Senate Report on the bill states:

(3) Boycotts by railroad employees, agricultural workers, Government employees, and other groups now excluded from the secondary boycott ban of the Taft-Hartley Act.—Under the definition section of the Taft-Hartley Act railroad employees, agricultural workers, and governmental employees are not employees within the meaning of the act. The Board has reached the conclusion that secondary boycotts by these exempt categories, and the inducement of such boycotts are not unfair labor practices. (See *International Rice Milling,* 84 N.L.R.B. 360, and *Di Giorgio Wine,* 87 N.L.R.B. No. 125.)

Secondary boycotts by these groups are just as much against the public interest as boycotts by anyone else.

*The bill, S. 748, would extend the ban to these excluded categories by use of the words "any person" instead of the use of the words "employees of any employer" in section 8(b)(4)(i) and (ii).*

1959 U.S.Code Cong. & Admin.News, p. 2384 (emphasis added).

Although the amendment appears on its face to carry out the Congressional intent, the definitions of "employee" and "employer," and hence "labor organization," were left unchanged. Thus, under a strict reading of the statute, RLA unions still were not within the Act. Literally interpreted,

---

4. The scope of secondary picketing allowed under the RLA is far from clear. *See Brotherhood of R. R. Trainmen v. Jacksonville Termi-* *nal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

the statute makes it appear that Congress has created a right without a remedy.[5] While this statutory argument has a surface plausibility, we reject it.

## IV.

The Landrum-Griffin amendments are hardly a model of clarity in statutory draftsmanship. The provision in dispute here is sufficiently ambiguous to require resort to its legislative history in any event.[6] However, assuming for the moment that the language is as clear as the district court and the appellee believe it to be, we would reach the same conclusion. There is no longer a "plain meaning rule" requiring a court to reach results completely at variance with the intent of the statute. As Mr. Justice Holmes stated in a celebrated passage:

> It is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.

*Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928).[7] This is as clear a case as any for looking beyond the words of a statute. In another case in which "[t]he contretemps arose through a cross-reference," Judge Friendly wrote:

> Congress is free, within constitutional limitations, to legislate eccentrically if it should wish, but courts should not lightly

assume that it has done so. When the "plain meaning" of statutory language "has led to absurd or futile results", the Supreme Court "has looked beyond the words to the purpose of the act"; "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' " the Court "has followed that purpose rather than the literal words." *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). "Anything that is written may present a problem of meaning, and that is the essence of the business of judges in construing legislation", Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 528 (1947). And, as we were told long ago, "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived;" Marshall, C. J., in *United States v. Fisher*, 2 Cranch (6 U.S.) 358, 386, [2 L.Ed. 304] (1805); see *United States v. Dickerson*, 310 U.S. 554, 561–562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940).

*J. C. Penney Co. v. Commissioner of Internal Revenue*, 312 F.2d 65, 68 (2d Cir. 1962).[8]

We follow the same principles here. One of the major concerns of the Landrum-Griffin amendments was the prohibition of secondary boycotts and picketing. *See* 1959 U.S.Code Cong. & Admin.News, pp. 2382–84. The amendments were explicitly intended to end the exemption from this pro-

---

**5.** This literal reading of the statute also leads to the odd conclusion that Congress, which was concerned with RLA unions engaging in secondary activities against NLRA employers, legislated only to protect RLA employers against secondary activities by NLRA unions.

**6.** Even under a strict version of the plain meaning rule, a court is bound not by clear wording, but by clearly expressed intent. A cursory examination of this statute dispells any such notion. Furthermore, we reject the idea that anything written has "plain meaning" divorced from its context. *See generally* C. Ogden and I. Richards, The Meaning of Meaning (8th ed. 1946).

**7.** *See also United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940):

> When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

(footnote omitted).

**8.** *J. C. Penney* decided that the language of the statute, literally read, swept too broadly—the exact opposite of this case. However, we see no reason for a different rule when it is clear that Congress did not say what it meant than when it did not mean what it said.

hibition enjoyed by RLA unions.[9] Moreover, there is a strong national policy against secondary activity by labor unions. *See generally NLRB v. Enterprise Ass'n of Pipefitters Local 638,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). Nonetheless, the district court felt compelled by "a plain reading of the statute"[10] to conclude that Congress failed to attain its objective, and instead legislated against an activity it had not considered. 418 F.Supp. at 612. No modern court is bound to such formalism. As Judge Learned Hand wrote over thirty years ago, in a case which disregarded the explicit language of a statute in favor of the clearly expressed legislative intent:

It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. Such treatment of a statute needs no apology today, whatever were the scruples of the past. There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final.

*Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), *aff'd. sub nom., Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

### V.

Appellees rely heavily on the opinion of the Supreme Court in *Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). This reliance is misplaced. The dispute in *Jacksonville Terminal* was over the validity of a Florida law banning secondary picketing. The parties were two railroads and a railway union. The Court held that the Florida statute was invalid because federal labor law had preempted the field. The Court explicitly did not decide whether the activity at stake was "primary" or "secondary," or whether it was protected by the RLA. 394 U.S. at 386–91, 89 S.Ct. 1109. However, in the course of his opinion, Justice Harlan included the following footnote:

In the debates preceding enactment of the Taft-Hartley amendments, 61 Stat. 141, 29 U.S.C. § 158(b), Senator Taft responded as follows to the criticism that it was inequitable to allow railroad employees to engage in conduct forbidden others by § 8(b)(4) of the NLRA:

"I want to point out that railway labor has never been covered by the Wagner Act; it has always been covered by the Railway Labor Act, which provides a somewhat different procedure. We saw no reason to change that situation, because there were no abuses which had arisen in connection with the operation of the Railway Labor Act." 93 Cong.Rec. 6498, 2 Legislative History of the Labor Management Relations Act, 1947, p. 1571. In 1959, § 8(b)(4) was amended to expand the class of persons protected against secondary pressures. 73 Stat. 542; see *United Steelworkers v. NLRB,* 376 U.S. 492, 500–501, 84 S.Ct. 899, 904–905, 11 L.Ed.2d 863, 869 (1964). However, the amendment did not expand the scope of "employees" or "labor organizations" whom the Act forbade to engage in such conduct.

*Id.* at 376–77 n.10, 89 S.Ct. at 1114. This ambiguous dictum, contained in a footnote, provides little basis for a major inroad into the national labor policy against secondary boycotts.

---

**9.** Commentators have suggested that Congressmen are more likely to rely on the Committee Report than the actual language of the statute. *See* Murphy, Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Colum.L.Rev. 1299, 1316 (1975).

**10.** *See* Murphy, *supra.*

The *Jacksonville Terminal* opinion, moreover, was careful to distinguish the case from one very like the present appeal:

> Whatever might be said where railway organizations act as agents for, or as joint venturers with unions subject to the NLRA, see *International Brotherhood of Electrical Workers v. NLRB*, 122 U.S. App.D.C. 8, 350 F.2d 791 (1965); or where railway unions are engaged in a dispute on behalf of their nonrail employees; or where a rail carrier seeks a remedy against the conduct of nonrailway employees, see *United Steelworkers v. NLRB*, 376 U.S. 492, 501 [84 S.Ct. 899, 11 L.Ed.2d 863] (1964); *Teamsters Union v. New York, N. H. & H. R. Co.*, 350 U.S. 155 [76 S.Ct. 227, 100 L.Ed. 166] (1956), none of these is this case. *This is a railway labor dispute, pure and simple.*

394 U.S. at 377, 89 S.Ct. at 1114 (emphasis added). Thus, we conclude that the decision in *Jacksonville Terminal* does not support the result reached in the district court below.[11]

### VI.

The appellants also vigorously urge that Local 504 is a "labor organization" because of its substantial non-RLA membership. The district court rejected this argument on the ground that 88 percent of the membership did come within the terms of the RLA. Substantial doubt is cast upon this contention by our decision in *National Marine Eng's Ben. Ass'n v. NLRB*, 274 F.2d 167, 173 (2d Cir. 1960). *See International Org. of Masters, Mates & Pilots v. NLRB*, 122 U.S.App.D.C. 74, 351 F.2d 771 (1965). However, in view of our construction of § 8(b)(4), it is unnecessary to decide this issue.

The grant of summary judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

11. We only decide that § 8(b)(4) is brought into play when one of the parties involved in a dispute is subject to the NLRA. *Jacksonville Terminal* indicates that § 8(b)(4) is inapplicable in a "pure" RLA dispute. 394 U.S. at 376–77, 391, 89 S.Ct. 1109.