198 F.3d 1078 (9th Cir. 1999)
 PACIFIC MARITIME ASSOCIATION, on behalf of itself and its individually injured members, Plaintiff-counter-defendant-Appellant,
v.
LOCAL 63, INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION; LOCAL 13, INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION; and INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 68, Defendants-counterclaimants-Appellees.
 No. 98-55453
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted October 7, 1999
Filed December 8, 1999
 
 1
 COUNSEL: Dennis A. Gladwell, Geniene B. Stillwell, Mark J. Payne, and Michele L. Maryott, Gibson, Dunn & Crutcher, Irvine, California, for the plaintiff-counter-defendant-appellant.
 
 
 2
 Elizabeth Garfield, Holguin & Garfield, Los Angeles, California, for the defendants-counter-claimants-appellees.
 
 
 3
 Appeal from the United States District Court for the Central District of California; James M. Ideman, District Judge, Presiding. D.C. No. CV-97-06757-JMI
 
 
 4
 Before: Pamela Ann Rymer and M. Margaret McKeown, Circuit Judges, and Edward F. Shea,[1] District Judge.
 
 OPINION
 SHEA, District Court Judge:
 
 5
 Appellant Pacific Maritime Association ("PMA") appeals the district court's dismissal of its suit against Appellee Local 68. The appeal presents an issue of first impression in this Circuit: whether Local 68, as a public sector union, is subject to liability for "secondary boycott" activity under S 303 of the Labor Management Relations Act of 1947[2] ("LMRA"), 29 U.S.C. S 187. The district court held 29 U.S.C. S 187 does not apply to public sector labor organizations and dismissed the suit for lack of subject matter jurisdiction. We affirm.
 
 I. Factual Background
 
 6
 Appellant PMA is a multi-employer association of shipping, stevedoring, and terminal companies operating out of the Los Angeles/Long Beach Port. PMA is the bargaining representative for the employers and handles their labor relations issues with respect to longshoremen and marine clerks. Appellee Local 68 of the International Longshore and Warehouse Union ("ILWU") represents a small bargaining unit of port pilots who are employed by the City of Los Angeles. The Local 68 port pilots have no employment relationship with PMA member companies. Local 13 and Local 63, also defendants in the original action, are also ILWU organizations. The members of Local 13 and Local 63 are longshoremen and marine clerks employed by PMA companies at the Los Angeles/Long Beach Port.
 
 
 7
 On about July 12, 1997, Local 68 went on strike following the expiration of its collective bargaining agreement with the City and unsuccessful contract renewal negotiations. That morning, Local 68 commenced picketing at the Yusen Terminal, a terminal operated by a PMA member. Members of Local 13 and Local 63 who were scheduled to work that day at Yusen Terminal refused to cross the picket line. On July 13, 1997, Local 68 continued picketing Yusen Terminal and began picketing the Matson and Evergreen Terminals. Members of Local 13 and Local 63 scheduled to work at the three terminals would not cross the picket lines. Local 68 picketed the three terminals for two more days, at which point the state court issued a temporary restraining order against the picketing.
 
 II. Procedural Background
 
 8
 On September 10, 1997, PMA filed suit for damages against Locals 13, 63 and 68 in federal district court under 29 U.S.C. S 187(b), Section 303 of the Labor Management Relations Act of 1947, for engaging in unfair labor practices, as defined in 29 U.S.C. 158(b)(4)(i) and (ii)(B). Specifically, PMA alleged that, under 29 U.S.C. 158(b)(4)(i) and (ii)(B), the three Locals "unlawfully engaged in, or induced or encouraged, individuals employed by PMA members to engage in a strike and a refusal, in the course of their employment, to handle or work on said vessels and cargoat[the] terminals, and to refuse to perform services thereat, and otherwise . . . unlawfully threatened, coerced, and restrained PMA and its members and other persons engaged in commerce." PMA further alleged an object of the Locals' conduct was to "force or require PMA and its members to cease doing business with the City of Los Angeles " in order to force the City to accede to Local 68's bargaining demands. PMA claimed its members were damaged in excess of $1,000,000 because of the four-day work stoppage which resulted from Local 68's picketing of the terminals.
 
 
 9
 Local 68 moved for dismissal for lack of subject matter jurisdiction. The district court granted Local 68's motion on the basis that Section 303 does not apply to public sector labor organizations such as Local 68. The court's order was entered January 20, 1998. PMA filed this appeal on February 18, 1998.
 
 III. The Standard of Review
 
 10
 Review of the district court's dismissal for lack of subject matter jurisdiction is de novo. United States v. Lockheed Missiles & Space Co., 190 F.3d 963, 968 (9th Cir. 1999). Review of a district court's interpretation of a statute is also a question of law reviewed de novo. Burrey v. Pacific Gas & Elec. Co., 159 F.3d 388, 392 (9th Cir. 1998).
 
 IV. The Statute
 
 11
 Section 303 of the LMRA, 29 U.S.C.S 187, provides
 
 
 12
 (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting com merce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
 
 
 13
 (b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
 
 
 14
 29 U.S.C.A. S 187 (West 1998) (emphasis added). United States Code Title 29 section 158(b)(4), which codifies section 8(b)(4) of the NLRA, in relevant part provides
 
 
 15
 It shall be an unfair labor practice for a labor organization or its agents--
 
 
 16
 (4)(i) . . . to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or com modities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is- . . .
 
 
 17
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . : Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 
 
 18
 29 U.S.C.A. S 158(b)(4) (West 1998) (emphasis added). Since Local 68 engaged in activities described by 29 U.S.C. S 158(b)(4)(i) and (ii)(B) which the industry terms "secondary boycott activities," at issue is whether Local 68 is a "labor organization," as the term is used in 29 U.S.C.SS 187 and 158 (b)(4).
 
 
 19
 "Labor organization," as it is used in 29 U.S.C. SS 187 and 158 (b), is defined as follows:The term "labor organization" means any organiza tion of any kind . . . in which employees participate and which exists for the purpose . . . of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or condi tions of work.
 
 
 20
 29 U.S.C. S 152(5) (West 1998) (emphases added).
 
 
 21
 "Employee" and "employer" are further defined:
 
 
 22
 The term "employee" . . . shall not include any indi vidual employed as an agricultural laborer, . . . or any individual employed by an employer subject to the Railway Labor Act [45 U.S.C.A. S 151 et seq.] . . . or by any other person who is not an employer as herein defined.
 
 
 23
 29 U.S.C. S 152(3) (West 1998) (emphases added).
 
 
 24
 The term "employer" . . . shall not include the United States or any wholly owned Government cor poration, . . . or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C.A. S 151 et seq.].
 
 
 25
 29 U.S.C. S 152(2) (West 1998) (emphases added).
 
 V. Statutory Interpretation
 
 26
 In several recent cases, the Supreme Court has reaffirmed that, in construing a statute, if the statute is clear, one looks no further. In Hughes Aircraft Co. v. Jacobson , the Court stated that, in any case of statutory construction, its analysis begins with the language of the statute. 119 S. Ct. 755, 760 (1999). "[W]here the statutory language provides a clear answer," the analysis also ends with the statute's language. Id. In Robinson v. Shell Oil Co., the Court announced that the first step in interpreting a statute is determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." 519 U.S. 337, 340 (1997). The inquiry ceases if the statutory language is unambiguous and " `the statutory scheme is coherent and consistent.' " Id. (citations omitted). The "ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341.
 
 
 27
 By the plain, unambiguous language of the LMRA, the definition of "labor organization" excludes an organization of employees of a political subdivision of a state. Because Local 68 represents port pilots employed by the City of Los Angeles, it is an organization of employees of a political subdivision of the State of California and is therefore not a "labor organization," as set forth in 29 U.S.C. S 152(5). Hence, Local 68, as a public sector union, is not subject to liability under 29 U.S.C. S 187 for "secondary boycott" activity. The language being plain and unambiguous, we have no call to consider legislative history.
 
 
 28
 We recognize the Second Circuit reached a different conclusion in Marriott In-Flite Services v. Local 504, Air Transport Division, 557 F.2d 295 (2d Cir. 1977). At issue in Marriott In-Flite Services was whether a union organized under the Railway Labor Act was a " `labor organization' subject to the secondary boycott provisions of 29 U.S.C. S 158(b)(4)." Id. at 295. The court determined that though a literal reading of the LMRA suggested a "Railway Labor Act" labor organization was not subject to 29 U.S.C.S 158(b)(4), id., the LMRA was sufficiently ambiguous to require resort to its legislative history, id. at 298. Citing the Senate Report on the 1959 amendments[3] to 29 U.S.C.S 158(b)(4), thecourt found that Congress intended the amendments to prohibit secondary boycott activity by, inter alia, workers governed by the Railway Labor Act. See id. at 297-98. Favoring its interpretation of Congressional intent over a literal reading of the LMRA, the court held that a union representing employees governed by the Railway Labor Act was a "labor organization" subject to the secondary boycott provisions of 29 U.S.C. S 158 (b)(4). See id. at 297-98.
 
 
 29
 However, two Supreme Court cases have reached holdings opposite the holding of Marriott In-Flite Services and essentially found the language of the LMRA to be plain and unambiguous. In Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., the Court noted that comprehensive federal legislation regulating railway labor disputes already existed when the NLRA was enacted. 394 U.S. 369, 376-77 (1969). This and the plain language of 29 U.S.C. S 158 (b)(4) led the Court to conclude that disputes covered by the Railway Labor Act remained exempt from the NLRA despite the 1959 TaftHartley amendments:
 
 
 30
 [i]n 1959, [29 U.S.C. S 158(b)(4) ] was amended to expand the class of persons protected against sec ondary pressures . . . . However, the amendment did not expand the scope of `employees' or `labor orga nizations' whom the Act forbade to engage in such conduct.
 
 
 31
 Id. at 377 n.10 (emphases added). The Trainmen Court further elaborated that, under the 1959 amendments, "Congress enacted `no . . . sweeping prohibition' of secondary conduct." 394 U.S. at 387-88 (citations omitted). Finally, the Court held that, "until Congress acts, picketing [by workers of employers subject to the Railway Labor Act] -whether characterized as primary or secondary -must be deemed conduct protected against proscription." Id. at 392-93. Thus, the Supreme Court determined that the 1959 amendments did not increase the types of labor organizations that could be held liable under 29 U.S.C. S 187; instead, the amendments broadened the activities for which the organizations already covered by the LMRA would be liable.[4] Notably, this decision preceded Marriott In-Flite Services. Yet, Marriott In-Flite Services dismissed parts of Trainmen as "ambiguous dictum." Marriott In-Flite Services, 557 F.2d at 299.
 
 
 32
 Ten years after Marriott In-Flite Services, the Supreme Court in Burlington N. R.R. Co. v. Bhd of Maintenance of Way Employes [sic] again stated that the NLRA "does not contain a `sweeping prohibition' of secondary[boycott] activity" but instead " `condemns specific union conduct directed to specific objectives.' " 481 U.S. 429, 440 n.7, 448 (1987) (citations omitted). Finding it significant that, under 29 U.S.C. SS 152(2) and (3), "Congress excluded rail carriers and rail employees from the coverage of the NLRA, " the Court concluded "that the NLRA could not make clearer Congress' intent to prohibit federal courts from [enjoining a union representing Railroad Labor Act employees from engaging in secondary boycott activity against railway companies other than the one employing the striking workers]. " Id. at 448-49.
 
 
 33
 Although Congress's rationale for excluding from the definition of "employer" all employers subject to the Railway Labor Act may have been different from its rationale for excluding all employers that are political subdivisions of a state, we find the Trainmen and Burlington Northern plain meaning interpretation of 29 U.S.C. S 158(b)(4) dispositive. The language of the LMRA plainly excludes an organization of employees of a political subdivision of a state from the 29 U.S.C. S 152(5) definition of "labor organization." Thus, given the plain language of 29 U.S.C. SS 152(2), (3), and (5) and SS 158 and 187, and given the Supreme Court's view of the plain meaning and intent of 29 U.S.C. S 158, we hold that an organization of public sector employees is not liable under 29 U.S.C. S 187 for damages caused by its secondary boycott activities.
 
 
 34
 That Appellant is without a remedy is for Congress, not this Court, to redress. As the Burlington Northern Court observed, " `if Congress should now find that abuses in the nature of secondary activities have arisen in the railroad industry . . . it is for the Congress, and not the Courts, to strike the balance between the uncontrolled power of management and labor to further their respective interests.' " 481 U.S. at 453 (quoting Trainmen, 394 U.S. at 392).
 
 
 35
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Edward F. Shea, United States District Judge for the Eastern District of Washington, sitting by designation.
 
 
 [2]
 June 23, 1947, ch. 120, Title III, S 303, 61 Stat. 158. The LMRA, also known as the Taft-Hartley Act, amended and encompasses the National Labor Relations Act ("NLRA") of 1935.
 
 
 [3]
 Section 704(a) of the Labor-Management Reporting and Disclosure Act ("LMRDA") of 1959 amended 29 U.S.C. S 158(b)(4). September 14,1959, Pub. L. 86-257, Title VII, S 704(a), 73 Stat. 542-545. The LMRDA is also known as the Griffin-Landrum or Landrum-Griffin Act.
 
 
 [4]
 This is also the position of the General Counsel of the National Labor Relations Board ("NLRB"), the federal agency responsible for enforcement of the LMRA. In the instant case, the NLRB "concluded that it did not have jurisdiction over Local 68 by reason of its representational status of public employees." (Appellant's Excerpts of R. at 5 P 12.) In previous cases, the NLRB General Counsel has held that a union that is not a labor organization under 29 U.S.C. S 152(5) cannot violate 29 U.S.C. S 158. See, e.g., Air Line Pilots Association, No. 12-CC-1217, 1990 NLRB GCM LEXIS 56 (NLRB Office of General Counsel, Dec. 27, 1990). In Air Line Pilots, the General Counsel held that a union comprising Railway Labor Act workers had not violated 29 U.S.C. S 158, though the union had induced secondary boycott activity, because the union was not a 29 U.S.C. S 152(5) "labor organization." See id. at *9-*10. "[T]he 1959 amendments provide that a labor organization violates [29 U.S.C. S 158(b)(4)(B)], even if the induced persons are not . . . employees [under 29 U.S.C. S 152(3)] and even if the restrained companies are not . . . employers [under 29 U.S.C. S 152(2)]. But the 1959 amendments did not change the requirement that the offending entity be a labor organization." Id. at *9 (emphasis added).