Opinion by Judge N.R. SMITH; Dissent by Judge MILAN D. SMITH, Jr.
*1112 OPINION
N.R. SMITH, Circuit Judge:
To avoid interruptions to interstate commerce, the Railway Labor Act treats labor relations in the national transportation industry differently from more generally applicable labor law. Section 152 First of the Railway Labor Act, 45 U.S.C. § 152 First (“section 2 First”), imposes a duty on all carrier employees to engage in the Act’s labor dispute resolution procedures before ceasing to perform their work. Because the employees of Aircraft Service International are carrier employees, they must comply with the Act. Because they are subject to this obligation, the district court did not abuse its discretion in issuing the strike injunction. The injunction did not violate the employees’ or other defendants’ First Amendment rights; it furthered the important governmental interest of regulating the economic relationship between labor and management and was no greater than essential to the furtherance of that interest.
Facts and Procedural History
Air Craft Service International, Inc., doing business as Air Craft Service International Group (“ASIG”), provides air craft services at Seattle-Tacoma International Airport (“Sea-Tac”). As part of such services, ASIG refuels approximately 75 percent of the airplanes at Sea-Tac.
On September 14, 2012, ASIG indefinitely suspended one of its employees, Alex Popescu. The parties dispute the reasons for his suspension. ASIG alleges it suspended Popescu for “inappropriate behavior, including screaming obscenities at his supervisor.” Popescu and other ASIG employees counter that he was suspended “in retaliation for his leadership on workplace safety issues, including testifying at a public hearing for the Seattle Port Commission.” The Seattle Port Commission hearing was held two days prior to his suspension and was Popescu’s second appearance before the Commission.
After Popescu’s suspension, other ASIG employees at Sea-Tac (“Employees”) decided to organize “a group response” to advocate for Popescu’s reinstatement. In organizing this response, Jonathan Rosen-blum of Working Washington[1] became heavily involved in this employer/employee dispute. After approximately two weeks of failed efforts to gain Popescu’s reinstatement, the Employees decided “by an overwhelming majority” to strike for up to eight hours on some future date.
Working Washington announced the Employees’ decision to strike at an October 3, 2012 press conference, even though no strike date was set. After the press conference, ASIG immediately filed a complaint in the United States District Court for the Western District of Washington against the International Brotherhood of Teamsters’ local chapter, Teamsters Local 117;[2] Working Washington; Jonathan *1113 Rosenblum; Alex Popescu; and unnamed ASIG employees. In the complaint, ASIG requested a temporary restraining order, a preliminary injunction, and a declaratory judgment for a permanent injunction to enjoin the strike as unlawful under the Railway Labor Act (“RLA”).
The district court issued a temporary restraining order on October 5, 2012, prohibiting all Defendants from striking or encouraging a strike at Sea-Tac. The order sought to “maintain the status quo pending the outcome of a hearing to determine whether a preliminary injunction should issue.” After a full hearing on October 17, 2012, the district court concluded that preliminary injunctive relief was proper, applying the factors in Winter v. Natural Resources Defense Counsel, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The Court issued the following strike injunction:
Alex Popescu, Working Washington, Jonathan Rosenblum, and John Does 1-100, and their officers, agents, employees, and members are hereby preliminarily enjoined from in any manner or by any means directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, encouraging, or engaging in any strike, work stoppage, sick-out, slow-down, work-to-rule campaign, or other concerted action in violation of the RLA which is intended to interfere with [ASIG’s] normal operations.
(footnote omitted).
“A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.” Winter, 555 U.S. at 20, 129 S.Ct. 365. Reviewing the district court decision as to the first Winter factor, the district court reasoned that the text and purposes of the Railway Labor Act (“RLA”), 45 U.S.C. § 151 et seq. (in particular section 2 First), support ASIG’s position that air carrier “employees are never permitted to strike as a first step.” The district court also concluded the second factor was satisfied, “because the threat of irreparable harm is largely self-evident from the underlying facts of the case. In essence, Defendants are threatening to shut down Sea-Tac Airport.” In balancing the equities, the district court found for ASIG, as “[a]n improperly granted injunction would ... merely delay[ ] resolution of [the Defendants’] dispute < with [ASIG].” Id. Finally, the court reasoned that the fourth Winter factor favored ASIG: “an unlawful strike would plainly be contrary to the public interest,” while “an injunction might prevent commerce from being severely disrupted.”
Popescu, Rosenblum, and Working Washington appealed the temporary restraining order and preliminary strike injunction. In the appeal, they challenge the district court’s exercise of jurisdiction over the dispute. They also contend the breadth of the injunction violates their First Amendment rights.
Standard of Review
“We review de novo a district court’s exercise of subject matter jurisdiction.” Burlington N. Santa Fe Ry. Co. v. Int’l Bhd. of Teamsters Local 174, 203 F.3d 703, 707 (9th Cir.2000). If we find the district court properly exercised jurisdiction, we will “review the district court’s decision to grant ... a preliminary injunction for abuse of discretion. Our review is limited and deferential.” Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir.2003) (internal citations omitted). That being said, “[t]he district court’s interpretation of the underlying le *1114 gal principles ... is subject to de novo review.” Id. In sum, the preliminary injunction will be upheld unless the district court “abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact.” E.E.O.C. v. Recruit U.S.A, Inc., 939 F.2d 746, 751 (9th Cir.1991).
Discussion
I. The Federal District Court has Jurisdiction over this Labor Dispute
Generally, the Norris-LaGuardia Act (“NLGA”) withdraws jurisdiction from federal courts to enjoin strikes “growing out of any labor dispute.” 29 U.S.C. § 104(a). Enacted in 1932, the NLGA “was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining.” Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Thus, “Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.” Id.
However, the NLGA “does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act.” Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 445, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (quotation marks omitted). Though enacted six years prior to the NLGA, the RLA has been recognized as an exception to the NLGA’s jurisdiction stripping provisions, because Congress sought to “channel[ ] the[ ] economic forces” the NLGA sought to protect, “in matters dealing with railway labor, into special processes....” Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co., 353 U.S. at 41, 77 S.Ct. 635. This channeling recognized “the failure of voluntary machinery to resolve a large number” of railway labor disputes “serious enough to threaten disruption of transportation.” Id. at 40, 77 S.Ct. 635. Indeed, Congress enacted the RLA after “decades of labor unrest that persistently revealed the shortcomings of every legislative attempt to address the problems.” Burlington N. R.R. Co., 481 U.S. at 444, 107 S.Ct. 1841. Through the Act, Congress sought to “protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce through failures of managers and employees to settle peaceably their controversies.” Union Pac. R.R. Co. v. Price, 360 U.S. 601, 609, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959) (quoting H.R.Rep. No. 328, 69th Cong., 1st Sess., p. 1).
Only ten years after its enactment, Congress “extended [the RLA] in 1936 to cover the airline industry.” Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 248, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (citing 45 U.S.C. §§ 181-188). Congress’s “general aim was to extend to air carriers and their employees the same benefits and obligations available and applicable in the railroad industry.”[3] Int'l Ass’n of Machinists v. Cent. Airlines, Inc., 372 U.S. 682, 685, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). This move aligned with Congress’s longstanding concern of “minimizing interruptions in the Nation’s transportation services by strikes and labor disputes.” Id. at 687, 83 S.Ct. 956.
Given this history, the RLA “cannot be appreciated apart from the environment *1115 out of which it came and the purposes which it was designed to serve.” Burlington N. R.R. Co., 481 U.S. at 444, 107 S.Ct. 1841. Congress explicitly stated the RLA’s purposes in the text of the statute itself:
(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.
45 U.S.C. § 151a. First and foremost, Congress was concerned about preventing “any” interruptions to interstate commerce, because of the pivotal role that railways and air carriers play in the national economy. Id. Further, Congress made clear its interest in “prompt and orderly” resolution of “all” labor disputes. Id. In sum, Congress enacted the RLA to eliminate interruptions to interstate commerce caused by labor disputes between carriers and their employees.
These purposes find application in section 2 First of the RLA, wherein Congress mandated that:
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
45 U.S.C. § 152 First.
Section 2 First imposes this duty on all carrier employees. Nothing in this section supports reading “all earriers[’] ... employees” to mean anything other than “all carriers’ employees.” In defining “employee” for purposes of the RLA, section 1 Fifth confirms this was Congress’s intent: employee means “every person in the service of a carrier ... who performs any work defined as that of an employee or subordinate official.” Id. at § 151 Fifth. Considering this text, it is an inescapable conclusion that, when the RLA references all carrier employees, that is precisely what Congress meant. See Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 951 (9th Cir.2009) (“The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.” (internal quotation marks omitted)).
At oral argument before this panel, the Employees conceded they were carrier employees, as defined in the RLA. As far as section 2 First is concerned, that is the end of the matter. They have a duty to diligently strive to make and maintain agreements and settle all disputes. See 45 U.S.C. § 152 First. Striking without even attempting to appoint a representative and collectively bargain violates this duty. Here, the Employees have made no attempt to engage in ■ the RLA’s procedures — the very mechanism designed by Congress to resolve carrier labor disputes. See Int’l Ass’n of Machinists v. Street, 367 *1116 U.S. 740, 760, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).
Notwithstanding the apparent clarity of this provision in its application to all carrier employees, the Employees argue the RLA does not provide federal jurisdiction over this dispute, because they have no enforceable duty under section 2 First. Instead, they first contend that section 2 First is only a policy, not an independent obligation. Second, they argue that, even if more than a policy, it only applies to unionized carrier employees.[4] Neither contention has merit.
The Employees first argue that section 2 First is a mere policy mobilized only by other RLA provisions. Their argument continues that the RLA’s other provisions only address resolving disputes over forming collective agreements (major disputes), interpreting such agreements (minor disputes), and appointing a representative (representation disputes). See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (major disputes); Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co., 353 U.S. at 33, 77 S.Ct. 635 (minor disputes); 45 U.S.C. § 152 Third, Fourth, and Ninth (representation disputes). Given their disinterest in all of the above, they argue the RLA does not compel them to do anything.
This argument is fatally flawed for two reasons. First, the Chicago & North Western Court explicitly rejected this narrow view of section 2 First previously advanced in Gen. Comm. of Adjustment of Bhd. of Locomotive Eng’rs for Mo.Kan.Tex. R.R. v. Mo.-Kan.-Tex. R. Co., 320 U.S. 323, 334, 64 S.Ct. 146, 88 L.Ed. 76 (1943) [hereinafter “M-K-T”]. Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 578, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (“In light of the place of § 2 First in the scheme of the Railway Labor Act, the legislative history of that section, and the decisions interpreting it, the passing reference to it in the M-K-T case cannot bear the weight which the Court of Appeals sought to place upon it.”).[5] Instead of being “a mere statement of policy or exhortation to the parties,” section 2 First “was designed to be a legal obligation.” Id. at 577, 91 S.Ct. 1731. This circuit has likewise found that section 2 First imposes an independent, mandatory duty enforceable by the courts. See Reg’l Airline Pilots Ass’n v. Wings W. Airlines, Inc., 915 F.2d 1399, 1402-03 (9th Cir.1990); accord, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass’n, Int’l, 238 F.3d 1300, 1304-05 (11th Cir.2001) (“It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a ‘specific provision’ of the RLA and, moreover, is central to the purpose and functioning of the RLA.”); Int’l Ass’n of Machinists & Aerospace Workers, AFL-CIO v. Trans World Airlines, Inc., 839 F.2d 809, 814 (D.C.Cir. 1988) (recognizing section 2 First as an “independent duty”).
Second, section 2 First’s text also condemns the Employees’ narrow view. All *1117 carrier employees have a specific duty to “exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise .45 U.S.C. § 152 First (emphasis added). Thus, carrier employees have a clear duty to “make” agreements, not just maintain preexisting ones. Perhaps this obligation could be cast as reaffirming the major and minor dispute resolution procedures for cases dealing with forming and interpreting collective agreements, respectively. But the presence of “or otherwise” demonstrates Congress’s intent to require labor disputes to be settled even if they do not fit into the major or minor resolution mechanisms. See Tabor v. Ul-loa, 323 F.2d 823, 824 (9th Cir.1963) (“[A] legislature is presumed to have used no superfluous words.”). Further, nothing in “or otherwise” limits its application to representation disputes only. Rather, “or otherwise” underscores the plain language in the obligation to “exert every reasonable effort” to “settle all disputes.” 45 U.S.C. § 152 First.
Accordingly, section 2 First is more than a policy gloss on the RLA’s other provisions. Section 1 a sets forth the RLA’s purposes and provides the policy. But in section 2, Congress enumerated duties, the first of which is section 2 First, “the heart of the Railway Labor Act.” Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 377-78, 89 S.Ct. 1109. Congress intended section 2 First to be taken at its terms as a duty. See Satterfield, 569 F.3d at 951.
The Second Circuit extended this line of reasoning in Summit Airlines v. Teamsters Local Union No. 295, 628 F.2d 787 (2d Cir.1980). The airline refused to recognize a union as their employees’ bargaining representative, and the union tried to force recognition through economic coercion. Id. at 789. When the airline sought injunctive relief under the RLA, the union argued that the court had no jurisdiction, because the union had not violated any duty in the RLA. Id. In rejecting this argument, the Second Circuit noted that section 2 First represented a “general obligation of both the carriers and their employees to attempt in good faith to resolve all disputes without resort to economic coercion.” Id. Further, it found that the representation dispute resolution procedures of section 2 Ninth were compulsory, even though in that case the dispute was between the carrier and the employees rather than between competing employee representatives. Id. at 795 n. 4. In so holding, the court reasoned that a contrary position would render sections 2 First and Ninth meaningless. See id. at 794-95. We find this reasoning persuasive and applicable to interpreting carrier employees’ obligations under section 2 First; a legal obligation sufficient to channel carrier labor disputes into the RLA’s various dispute resolution procedures. See also e.g., In re Nw. Airlines Corp., 483 F.3d 160, 168, 174-75 (2d Cir.2007) (enjoining employees’ strike even though the parties’ CBA was abrogated in bankruptcy, because section 2 First is a separate duty that “operates independently of the RLA’s status quo provisions”).
In their second argument, the Employees contend that, even if section 2 First represents more than a policy, it only applies to unionized carrier employees. This view is inconsistent with the text of section 2 First, which applies to “all carriers[’] ... employees.” 45 U.S.C. § 152 First. While the import of this conclusion is to push carrier employees contemplating collective action into the RLA’s procedures, such is as Congress intended.
*1118 The Supreme Court made clear that “Congress has given the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations in the industry.” Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 760, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). “The Railway Labor Act was passed ... to encourage collective bargaining by [carriers] and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce.” Detroit & T.S.L.R. Co. v. United Transp. Union, 396 U.S. 142, 148, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); see also Tex. & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 74 L.Ed. 1034 (1930) (“[T]he major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes.” (internal quotation marks omitted)). Further, collective bargaining has been described as “the method of settling [carrier labor] disputes.” Int’l Ass’n of Machinists v. Street, 367 U.S. at 760, 81 5.Ct. 1784 (emphasis added). Thus, while the RLA “does not undertake to compel agreement between the employer and employees, ... it does command those preliminary steps without which no agreement can be reached.” Virginian Ry., 300 U.S. at 548, 57 S.Ct. 592.
Furthermore, the Supreme Court and this circuit have plumbed the depths of section 2 First. It is not meant to reach disputes between a carrier and an individual employee. See Hawaiian Airlines, 512 U.S. at 255, 114 S.Ct. 2239; Williams v. Jacksonville Terminal Co., 315 U.S. 386, 400, 62 S.Ct. 659, 86 L.Ed. 914 (1942). Similarly, section 2 First does not create a private right of action for employees trying to force a union and carrier to comply with the RLA’s procedures. Herring v. Delta Air Lines, Inc., 894 F.2d 1020, 1022-23 (9th Cir.1989). Congress instead meant the RLA for collective disputes directly between the carrier and its employees. See id. at 1022.
These decisions raise no red flags with respect to the interpretation of section 2 First here advanced. Section 2 First clearly applies to all carrier employees, and it imposes upon them an obligation to “exert every reasonable effort” to make labor agreements and settle labor disputes. The provisions of the RLA provide the preliminary mechanism for doing so. Failure to perceive this connection between section 2 First’s duty and the RLA’s procedures would allow carrier employees to leverage their critical role in interstate commerce and exploit it in their quest for concessions. Such would contravene the RLA’s purposes, as clearly stated in the text. See 45 U.S.C. § 151a.
Therefore, the Employees’ decision to strike before appointing a representative and attempting to collectively bargain under the procedures of the RLA is a violation of their duty in section 2 First. Instead, the Employees must appoint a representative according to section 2 Third, Fourth, and Ninth (if necessary).[6] With a representative, they can then get down to settling their dispute -with ASIG and shouldering their duty under section 2 First.[7] Only if the parties properly pro *1119 ceed through the applicable RLA “procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute.... ” Burlington N. R.R Co., 481 U.S. at 445, 107 S.Ct. 1841; see also Paul M. Schmidt, Comment, Trans World Airlines v. Independent Federation of Flight Attendants: Introducing a New Economic Weapon into the Labor Law Arena, 38 U. Kan. L.Rev. 1061,1079 (1990) (“Because the RLA was enacted out of a strong congressional concern for ‘uninterrupted commerce,’ procedural mechanisms were inserted in the RLA to achieve that end.”).[8]
Finding certain aspects of the RLA compulsory is not unprecedented. See e.g., Bhd. of R.R. Trainmen v. Chicago R. & Ind. R., 353 U.S. at 39, 77 S.Ct. 635 (finding arbitration under section 3 compulsory); Summit Airlines, 628 F.2d at 794 (holding that section 2 Ninth is compulsory). Further, the facts of this case are distinguishable from the Fifth Circuit’s discussion in Russell v. Nat’l Mediation Bd., 714 F.2d 1332 (5th Cir.1983). The Employees are not trying to deal individually with management. Rather, their decision to strike is the epitome of collective action. In Russell, the Fifth Circuit reversed a decision by the National Mediation Board denying certification to an individual as class representative of carrier employees. Id. at 1341. The Board denied the individual’s application, because he planned to abrogate all existing collective bargaining agreements. Id. at 1336. In rejecting the Board’s argument that section 2 First requires carrier employees to engage in collective bargaining, the court noted that the RLA “supports but does not require collective bargaining.” Id. at 1343. Rather, “[i]f the employees do not wish to organize, prefer to deal individually with management ... why, that course, is left open to them, or it should be.” Id. (quoting H.R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 57 (1934)). In the instant case, however, the Employees are not attempting to deal individually with management; they intend to strike. When carrier employees have such an intention, they may do so only if they have followed the RLA and carried their duties under it. Burlington N. R.R. Co., 481 U.S. at 445, 107 S.Ct. 1841.
Further, our interpretation of the RLA does not permit “freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place.” Chicago & N.W., 402 U.S. at 583, 91 S.Ct. 1731. In Chicago & North Western, the Supreme Court under *1120 scored the propriety of a strike injunction where carrier employees are only “going through the motions” in complying with the RLA’s procedures and yet threaten a strike. 402 U.S. at 575, 578, 91 S.Ct. 1731. In such a circumstance, enjoining the strike would be “the only practical, effective means” to enforce compliance with section 2 First. Id. at 583, 91 S.Ct. 1731.
Here, the Employees are unwilling to even “go through the motions” under the RLA; rather, they wish not to bargain but to strike. In so doing, they present the very situation for which Congress enacted the RLA: carrier employees collectively threatening a strike capable of single-handedly interrupting interstate commerce by shutting down an airport. See e.g., Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 378, 89 S.Ct. 1109 (A dispute that “threatens substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service” is of the kind envisioned by the Act to be enjoined, (internal quotation marks omitted)) (speaking in context of major dispute resolution procedures). The purposes of the RLA, as stated in the text, would be thwarted were the strike not enjoined. See 45 U.S.C. § 151a. Indeed, the formal procedures of the RLA were enacted to prevent this precise interruption to interstate commerce from occurring.
Accordingly, the district court’s exercise of jurisdiction and issuance of the strike injunction are hardly “freewheeling”; they have the support of the RLA and Supreme Court and Ninth Circuit precedent. See id.; Chicago & N.W., 402 U.S. at 583, 91 S.Ct. 1731; Reg’l Airline Pilot Ass’n, 915 F.2d at 1402 (Under the RLA, “the federal courts’ obligation is to oversee the broad structure of the process and prevent major deviations.... ”). Simply because a group of carrier employees does not meet the typical unionized mold does not mean Congress intended their strike to be above the law.
Next, Appellants argue that, if the Employees were allowed to strike, ASIG would also be entitled to engage in self help, i.e., through firing employees or giving and then withdrawing concessions. But such an arrangement does not mean the RLA’s purposes are being preserved or its text honored. It is hard to think of a situation in this context more harmful to interstate commerce.[9] Thus, we come full circle: in interpreting section 2 First, the RLA’s text-based purposes illuminate its meaning. We are not second-guessing the text with snippets of drafters’ comments. Rather, Congress chose to express its collective intent by specifying the Act’s purposes in its text. Thus, any ambiguity in *1121 section 2 First can be resolved with a glance to the RLA’s stated purposes. See Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 877 (9th Cir.2001). Specifically, finding no duty under the RLA applicable to the Employees here would offend the purposes of eliminating interruptions to interstate commerce and promptly settling all carrier labor disputes. It would also be inconsistent with section 2 First’s text.
The employees contend that the dearth of cases like this one supports their interpretation of section 2 First. However, the fact, that neither the Supreme Court nor this circuit have ever directly answered the question posed by the parties, supports the result we reach. Disputes under the RLA usually involve carrier employees who have unionized or have at least appointed a representative. Indeed, a case like the instant one is rare. But this is probably because carrier employees usually unionize. See Int’l Ass’n of Machinists v. Street, 367 U.S. at 750, 81 S.Ct. 1784 (The “railway industry is marked ... by a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions.”). The rarity of disputes like this one may also indicate that the RLA is accomplishing its purposes by channeling labor disputes through its procedures. The statutory text and case law confirm this was Congress’s intent in enacting the RLA.
Finally, section Eight of the NLGA does not strip the district court of jurisdiction. Rather, it prohibits issuing a restraining order or injunction in favor of a:
complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.
29 U.S.C. § 108. Because a specific RLA duty applies in this controversy, the NLGA does not control its resolution. See Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass’n, 491 U.S. 490, 513, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (District courts have “jurisdiction and power to issue necessary injunctive orders to enforce compliance with the requirements of the RLA notwithstanding the provisions of the Norris-LaGuardia Act.” (internal quotation marks omitted)); Burlington N. R.R. Co., 481 U.S. at 444-45, 107 S.Ct. 1841 (“In certain limited circumstances, the Norris-LaGuardia Act does not prevent a court from enjoining violations of [a] specific mandate of [the RLA].”). Further, ASIG desires to resolve a dispute with its employees the way Congress intended — through the procedures of the RLA. Given our conclusion that the Employees have not carried their duty under the RLA, ASIG has shirked none of its duties. For both reasons, this provision does not alter our conclusion.
Accordingly, we find the district court’s exercise of jurisdiction in this case proper, because the Employees are covered by the RLA and have a “legal obligation” with which they have not complied. See Chicago & N.W., 402 U.S. at 577, 91 S.Ct. 1731.
II. Permissibility of the Strike Injunction vis-á-vis the First Amendment
The Employees and Working Washington contend the strike injunction, in its breadth, violates their First Amendment rights.. In essence, they challenge the district court’s application of the third Winter factor, balancing the equities. See Warsoldier v. Woodford, 418 F.3d 989, 1002 (9th Cir.2005).
However, given our conclusion that section 2 First imposes an obligation upon the *1122 Employees under the RLA, the district court may enjoin certain actions as unlawful. See Burlington N. R.R., 481 U.S. at 455, 107 S.Ct. 1855. More specifically, the Supreme Court has held that obligations imposed under section 2 First are “enforceable by whatever appropriate means might be developed on a ease-by-case basis,” including strike injunctions. Chicago & N.W., 402 U.S. at 577, 583, 91 S.Ct. 1731. Considering Congress enacted the RLA to “avoid any interruption to commerce or to the operation of any carrier engaged therein,” 45 U.S.C. § 151 a, and given the district court’s reasonable finding that permitting the strike would essentially shut down the entire Sea-Tac Airport, enjoining the Employees’ strike was not an abuse of discretion.
Further, we have been unable to identify any case in the Supreme Court or any of the courts of appeal invalidating a strike injunction (authorized under the RLA) because of First Amendment concerns. To the contrary, the Court has consistently found that actions inconsistent with national labor laws are generally not protected by the First Amendment. See e.g., Int’l Longshoremen’s Ass’n v. Allied Int’l, Inc., 456 U.S. 212, 226, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982) (secondary boycott illegal under the NLRA warrants no First Amendment protection); Int’l Bhd. of Elec. Workers v. N.L.R.B., 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1951) (“We find no indication that Congress thought that the kind of picketing and related conduct which was used in this case to induce or encourage a strike for an unlawful object was any less objectionable than engaging directly in that strike.”); accord Miller v. United Food & Commercial Workers Union, 708 F.2d 467, 471 (9th Cir.1983) (“Because of the government’s strong interest in regulating the economic relationship between labor and management, Congress may constitutionally enact measures which impact on the speech element of picketing.”). In so holding, the Court has surmised that “conduct designed not to communicate but to coerce merits still less consideration under the First Amendment.” Int’l Longshoremen’s Ass’n, 456 U.S. at 226, 102 S.Ct. 1656.
Nevertheless, “[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.” Thornhill v. Alabama, 310 U.S. 88, 101-02, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Indeed, “the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.” Id. at 102, 60 S.Ct. 736.
In Miller v. United Food & Commercial Workers Union, 708 F.2d at 472, this circuit held that a district court could enjoin informational picketing in the midst of a labor dispute, given the mixture of speech and conduct, if the injunction “furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” The relief should “promote[] the purposes of Congress without regard to the content of the ideas expressed.” Id.
The speech-to-conduct ratio is lower in the context of a strike than in informational picketing. Further, nothing in the district court’s preliminary injunction prohibits Popescu, the Employees, Working Washington and its members, or Rosen-blum from “discussing] publicly and truthfully” the facts of the Employees’ labor dispute with ASIG. The strike injunction *1123 merely prohibits the parties from striking or encouraging a strike at Sea-Tac.
The Employees and Working Washington contend this injunction impermissibly extends to “constitutionally protected speech, expressive activity and association — including, for example, rallies, public demonstrations, consumer boycotts, banners, signs, leaflets, petitions, press releases, news broadcasts, interviews, websites and social media — that could be construed as promoting or encouraging current or future group action by ASIG employees.” However, the injunction, by its terms, fails to be as broad as the Employees and Working Washington make it out to be. Instead, the injunction is much more limited. Reading it plainly, the Employees cannot strike against ASIG, and neither they nor Working Washington may encourage as much. Other than that, the Employees and Working Washington may freely exercise their First Amendment rights in seeking better working conditions at ASIG and anywhere else. “There are many ways in which [Defendants] may express their opposition to [ASIG working conditions, etc.] without infringing upon the rights of others.” Int’l Longshoremen’s Ass’n, 456 U.S. at 227, 102 S.Ct. 1656.
Therefore, the district court did not abuse its discretion in finding the balance of the equities favored ASIG and issuing the strike injunction.
III. Conclusion
Because the Employees have breached their duty under section 2 First of the RLA, the district court properly exercised jurisdiction and enjoined the Employees’ strike. The district court did not abuse its discretion in issuing the strike injunction against the Employees and Working Washington. The district court’s judgment is therefore AFFIRMED.

. Jonathan Rosenblum has been "a union and community organizer since 1984.” During the time of this dispute, he functioned as the Campaign Director for Working Washington.
Working Washington describes itself as "a coalition of individuals, neighborhood associations, immigrant groups, labor unions, civil rights organizations, and people of faith united in support of quality jobs and a fair economy.” Working Washington claims extensive ties to various employee groups at Sea-Tac, including baggage handlers, passenger service workers, ground transportation employees, taxicab drivers, cargo handlers, and fuellers. It has organized various efforts "to advocate for safety and respect on the job” at Sea-Tac, among other places.
Working Washington is not a labor union and has not been selected by ASIG's Employees to represent them.

. Teamsters Local 117 was initially implicated in ASIG's complaint, though eventually the parties stipulated to its dismissal.

. "The 1936 amendments made applicable to the airlines all of the provisions of the Railway Labor Act, excepting § 3, 45 U.S.C. § 153, dealing with the National Railroad Adjustment Board.” Int'l Ass’n of Machinists v. Cent. Airlines, 372 U.S. 682, 685, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). Section 3 is not relevant to this case.

. ASIG’s Employees are not unionized, and they have not selected Working Washington, which purports to speak for them, as their union or representative.

. Our respected colleague’s dissent fails to recognize this. Dissent at 1126-27. We are "wholly reifying] on the Court's subsequent holding” in Chicago & North Western, dissent at 1126-27, because that Court explicitly rejected the M-K-T Court’s interpretation of section 2 First upon which the dissent so heavily relies. The Chicago & North Western Court also confirmed that Virginian Railway Company v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) "considered and affirmed” that section 2 First imposes an independent, enforceable duty. 402 U.S. at 579, 91 S.Ct. 1731.

. The dissent mischaracterizes our opinion as requiring unionization. Dissent at 1126, 1127-28, 1128. The RLA's dispute resolution procedures can only be navigated by party representatives. See e.g., 45 U.S.C. § 152 Second, Fourth, Sixth. Therefore, appointing a representative is required before carrier employees are permitted to strike. While the RLA does not require carrier employees to form or join a labor union, it does require them to appoint a representative before striking.

. Our dissenting colleague argues that we have created an "impossible burden” for the Employees, because (1) the National Media *1119 tion Board declined to mediate their dispute, dissent at 1128-29, and (2) appointing a representative would be difficult, dissent at 1128-29 n. 11. However, the NMB did not decline to mediate, because the employees were incapable of appointing a representative. Dissent at 1128. Instead, the NMB told the Employees that it only resolves disputes between "carriers and the designated bargaining representatives of their employees.” Thus, the advice, that the NMB told the Employees, complies with the law as outlined herein.
Second, the dissent's concerns about the Employees’ ability to appoint a representative are premature at this point in the dispute. The employees have not attempted to appoint one. Likewise, the dissent's citation to the NMB opinion, dissent at 1128-29 n. 11 (citing 40 NMB No. 13), ignores the fact that that case involved a representation dispute between two competing representatives. Predicting such a dispute would arise if the Employees attempt to appoint a representative is also premature.

. The dissent seems to argue that if section 2 First imposes this duty, the Employees have somehow satisfied it through seeking Rosen-blum's reinstatement and asking the NMB to mediate their dispute. Dissent at 1128-29. However, given the text, purposes, and structure of the RLA, these efforts do not satisfy their duty under section 2 First.

. Furthermore, commentators and courts have recognized that the RLA’s dispute resolution process “is ‘purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.’ " Harvey R. Miller, Michele J. Meises, Christopher Marcus, The State of the Unions in Reorganization and Restructuring Cases, 15 Am. Bankr.Inst. L.Rev. 465, 470 (2007) (quoting Bhd. of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966)). " '[DJelaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout.' ” Id. at 471 (quoting Detroit & Toledo Shore Line R.R. Co., 396 U.S. at 150, 90 S.Ct. 294). Permitting an immediate strike (and consequent interruption to interstate commerce), simply because carrier employees refuse to appoint a bargaining representative or make a collective bargaining agreement, is inconsistent with this aim of the RLA as well.